[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 366 
This is a tort action by Harvey Cornell, individually, and for the use and benefit of his infant child, Joe Adger Cornell, to recover damages for personal injuries to said child, resulting from alleged negligent acts of the agents and employees of defendant sanitarium, and for expense bills incurred in treating said injuries. The injuries suffered are in the nature of severe burns upon the infant's left shoulder, left flank of the body and on the front and back of the left arm, as a result of contact with water bottles excessively heated, used in regulating the temperature of an incubator in which the infant was placed on the occasion of its birth.
The sanitarium's insurer, United States Fidelity and Guaranty Company, is also impleaded as a defendant. Herein, reference to defendant in the singular number means the sanitarium.
The trial of the case was before a jury at the request of the plaintiff. From a judgment in his favor, individually, in the sum of $1,038.35, and for the benefit of the infant son, in the sum of $3,500, the defendants prosecute this appeal.
The following are substantially the facts forming the basis of this case:
On February 11, 1940, plaintiff's wife, Nina Adger Cornell, was an expectant mother. Dr. C.R. Mays, a reputable physician, specializing in obstetrics, was engaged by her husband as attending physician. The possibility of a premature delivery becoming evident, she was, by order of her physician, removed to defendant sanitarium where she was received as a maternity patient at about one o'clock P.M. of said date. Some time in the afternoon of the following day, the imminence of a premature delivery becoming positive, orders for the necessary preparations were given the hospital authorities by the attending physician.
Defendant sanitarium is a private institution, equipped and staffed for general hospital service. Among its departments *Page 367 
is that of the obstetrical or maternity ward. A part of the necessary equipment of this ward, as in all modern hospitals, is an incubator, the use of which is imperatively necessary in the proper care of premature infants. The most modern of these instruments are electrically heated and controlled, however, heat supplied by means of hot water bottles, properly prepared and adjusted, is recognized as comporting with proper use and such methods are accepted as efficient. This sanitarium was equipped with a modern electrical incubator, but on this occasion, the electrical control was out of order, a fact not known by the attending physician until after his patient had been admitted. The use of hot water bottles was substituted for heating the incubator, either by order of or with the approval of the attending physician.
It appears that one of the routine duties of the nursing staff of all hospitals, when there is a patient expecting premature delivery, as in this instance, is to properly prepare and condition the incubator for instant use. It appears to be common knowledge of all physicians and nurses that the heat generating organism of all premature infants is dormant at birth and a surrounding constant temperature of ninety-nine (99°) degrees to one hundred (100°) degrees Fahrenheit is imperative to life until the infant's own heat generating organism functions. The proper preparation of the incubator consists of adjusting its temperature to this degree. It appears that in the performance of this routine duty, one of the nursing staff placed three hot water bottles in the incubator shortly after notice of its contemplated use. Miss Doris Smith, a third year student nurse, and on duty at the time as a circulating nurse, testified that she refilled these hot water bottles at 8:45 P.M.; that being advised that delivery was not expected until around 12:00 o'clock, she did not test the temperature of the water nor insulate the bottles; that she placed them exposed in the bottom of the incubator only to keep it warm. At 9:15 o'clock, or just thirty minutes later, the same nurse, Miss Smith, assisted Dr. Mays in rushing the patient to the obstetrical room. At 9:32 o'clock the patient gave birth by breech delivery to the premature infant which weighed three and one-quarter (3 1/4) pounds. Some ten minutes were required by the physician to resuscitate the infant, after which, and on wrapping it in a sterile carrying gown, it was placed in the incubator by Dr. Mays. At or about this time, Dr. George S. Wolfe, a baby specialist engaged by plaintiff, arrived in the operating room and assumed all further charge of the infant. After an examination and further treatment by Dr. Wolfe, the infant was ordered transferred to another room where it was placed in the charge of Mrs. Prater, a special nurse employed by plaintiff. On taking charge at 10:30 o'clock P.M., Mrs. Prater found the infant's temperature to be elevated and she immediately removed all the hot water bottles from the incubator. According to her testimony, the incubator contained only three hot water bottles, but all contained water "hot enough to burn". Two bottles were "under and to the left side" of the infant, and un-insulated from direct contact by only the carrying gown in which the infant was wrapped. The remaining bottle was "to the right side and further away". Some thirty minutes later, Mrs. Prater made a discovery which she described on her clinical chart, at the time, as "dark hard splotches noted on left side and back". Mrs. Prater went off duty before Dr. Wolfe's morning call and, by reason of illness, did not return, but before doing so, she fully reported her discovery to the supervisor of nurses. It appears that the supervisor accompanied Dr. Wolfe when he made his first morning call on the infant, but for some unaccountable reason, these suspicious conditions were not brought to his attention until after some forty-eight hours, when these so-called "splotches" were found to be vicious third degree burns across the infant's back and along his left side.
Under the foregoing factual situation, plaintiff alleges negligence by the defendant, as follows:
"1. In permitting the incubator to remain out of order when they knew it would be needed.
"2. In not providing another incubator when they knew the one in this room was out of order, or could have so known by the use of ordinary and reasonable diligence in inspecting their equipment.
"3. In furnishing incompetent nurses.
"4. In placing the hot water bottles in the middle of the incubator rather than in their proper place around the edge of said incubator. *Page 368 
"5. In filling the hot water bottles with water that was too hot.
"6. In not notifying the physician of the baby's burns until several hours after they had been discovered."
For answer, defendants admit most of the narrated facts, but specifically deny the alleged negligence of the sanitarium's agents and employees, as well as the extent of the injuries alleged to have been suffered.
As a further defense, defendants set up the following:
That the use of hot water bottles to regulate the temperature of incubators comported with due care and the fact that the incubator was out of order had no connection with the accident alleged; that plaintiff's agent, the attending physician, ordered the incubator to be heated with hot water bags and that the bag placed in the middle of the incubator was in plain view of the doctor, who knew its position and presence, and who forbade its removal by the nurse; that the nurses furnished by defendant were trained and competent and were, at all times, under the direct supervision and control of plaintiff's agent, Dr. Mays. But, if it be found that they were agents and servants of defendant and were negligent, all of which is denied, in the alternative it is averred that their negligence resulted from errors of professional judgment; that the sole and proximate cause of the alleged injuries was the negligent acts of plaintiff's agents, the attending physician and special nurse. But if the court should hold that defendant or its agents was negligent in the matter of the alleged injuries, which is denied, then, in the alternative, defendants specially plead as the contributing cause, in bar of recovery by plaintiff on his individual demand, the negligence of plaintiff himself through his agents and servants in the following respects:
1. That Dr. Mays, plaintiff's attending physician, supervised and directed the heating of the incubator and placed the baby therein; that he knew at the time of the presence of the hot water bottles in the incubator, and forbade their removal therefrom.
2. That Mrs. Prater, plaintiff's special nurse, was in charge of the baby before and at the time it is alleged to have been burned; that she knew of the presence of the hot water bottles in the incubator, but failed to remove or adjust them; that she knew of the accident immediately after its occurrence, but failed to report the same until about 3:00 o'clock the following afternoon.
We find no proof of or merit in the contention that defendant furnished untrained or incompetent nurses. Nor can it be said that the defective condition of the incubator, in itself, attributed to the injuries. Incubators, when heated by hot water bottles properly tested and adjusted, are shown to be serviceable and efficient. There is not a scintilla of evidence of any negligence on the part of the nurse, Mrs. Prater. There is evidence, however, suggestive of concerted action by the nursing staff in withholding information of the injuries from the attending physician. However, it is established by medical testimony that this delay did not aggravate the injuries, and this being true, such neglect is not material to the issues herein involved.
The evidence is clear that the infant was gravely and severely injured by burns as a result of being placed in the incubator and in contact with hot water bottles therein, excessively heated and improperly adjusted.
Plaintiff's theory of the case is that the proximate cause of the injury was the acts of defendant's employee, Miss Smith, in the improper preparation and conditioning of the incubator. It is urged by the defendants that the act of Dr. Mays, in placing the infant in the incubator without first inspecting its condition, was the proximate cause of the injury; that though nurse Smith may have been negligent in the prior act of preparation, it was the responsibility and duty of the attending physician to first examine and inspect for such errors; that Miss Smith attempted to correct her error, but was prevented by the physician, and that, as a consequence, the physician's act was an intervening or superseding independent one that relieves defendant of liability.
In determining the presence or absence of negligence in the acts of Miss Smith, we need examine only her own testimony. She admits that, as a routine duty, she filled and placed hot water bottles in the incubator some forty-five minutes before its use, and that, she neither tested the temperature of the water used nor insulated the bottles. She further admits that she was present and assisted Dr. Mays *Page 369 
at the time the infant was placed in the incubator, and that she and she alone knew the water bottles therein were untested and uninsulated, having herself placed them there in this condition; yet, she did not reveal this dangerous situation to either the physician or her co-nurses. Her excuse for this unnatural silence is, to say the least unimpressive. We are reluctant to accept as a fact that the professions of medicine or nursing would, for a moment, tolerate a rule or regulation whereby a nurse is not permitted to speak or give warning of a danger to her superior, or the operating physician, particularly when the danger is of her own making and known only to her, as in this instance.
But it is urged that Miss Smith made an effort to correct this dangerous condition but was prevented by the order of the physician. On this issue we have the affidavit of Miss Smith made shortly after the occurrence, as follows:
"I went to see if hot water bags were still under the baby and finding one there, I proceeded to remove it when I was noticed by Dr. Mays and ordered to put it back close to the baby, because Dr. Mays said that being premature, it needed more heat than a full time baby would need."
When testifying later as a witness in this case, her version of Dr. Mays' directions, is materially different. She then said:
"I took the hot water bottle from under the baby but Dr. Mays told me to leave the hot water bottle alone. He had them fixed like he wanted them."
She is positive that she removed the bottle from underneath the infant and placed it at its feet. Her co-nurses, called as witnesses, all corroborated her to the effect that she attempted to adjust or remove a bottle and was interrupted by Dr. Mays. All remember the physician giving a reason for the order similar to Miss Smith's first version, namely, "premature infants require more heat than normal infants". Miss Huddleston, the supervisor, is positive that she saw Dr. Mays place the infant directly on top of one of the bottles, but that, the bottle was immediately removed and placed at the infant's feet by Miss Smith. She also testified that a fourth bottle was placed in the incubator by Dr. Mays.
Immediately after the removal of the infant to a private ward, the bottles were removed from the incubator by the special nurse, Mrs. Prater. Her testimony is that only three bottles were in the incubator. Two were "under and to the left side" and the other "to the right side and further away". The position of the burns across the back and along the left side of the body of the infant positively corroborates Mrs. Prater's testimony as to the position of at least two of the bottles and, at the same time, it strongly contradicts and discredits the evidence that a bottle was removed from underneath the infant by Miss Smith. It is quite logical and probable that Miss Smith did attempt to adjust the water bottles after the infant was placed in the incubator. Knowing the dangerous condition, as she admittedly did, such an act would be most natural and prompted by a most humane impulse. The proof that Dr. Mays observed and protested this act is supported by evidence in many respects not altogether satisfactory. But even so, could it be said that such an order from the physician, under these circumstances, was other than a proper precautionary one? He had the right to assume that the condition of the incubator was as safe and free from danger as any surgical instrument used by him and furnished by the defendant. There is no evidence, by either work or act of Miss Smith, that would indicate a warning to the physician of the dangerous condition of the incubator.
But it is urged that, notwithstanding the negligence of Miss Smith, the physician had knowledge or ought to have acquainted himself with the condition of the incubator before its use; that the uninsulated bottles were exposed to view along the bottom of the incubator and the physician's act, under these circumstances, was independent and intervening, or a superseding cause to that of the nurse and was the proximate cause of the injury.
Negligence is not a necessary factor in an intervening act or superseding cause. It may or may not exist. Its presence is not essential to an act constituting the proximate cause of an injury. Dr. Mays, not being a defendant in this suit, his negligent acts, if any, are material to the issues herein involved only insofar as their existence may be urged as contributing to the injury.
In determining the relation and effect of the physician's acts to the injury, it is necessary that consideration be given to the circumstances and conditions surrounding the acts. *Page 370 
The defendant's sanitarium is admittedly modern. It is staffed by competent and specially trained nurses and attendants. Its obstetrical or maternity ward is equipped with all modern instruments and facilities necessary and required in the proper treatment of maternity cases. The conditioning and proper care of these facilities, including the infant incubator, is under the direct supervision of the hospital through its nursing staff. By engaging these services the physician or surgeon relieves himself of these detailed duties. These advantages are one of the primary purposes for the existence of hospitals. It is established by proof that a strict rule and regulation of all hospitals requires the testing and insulating of hot water bottles before use. A temperature of ninety-nine degrees (99°) to one hundred (100°) degrees Fahrenheit, necessary for the infant incubator was established to be common knowledge of all of the nurses and required no special order of a physician. The delivery here was breech and premature, a first born. These conditions are accompanied with grave dangers to the mother and require the undivided attention and skill of the attending physician. To demand that he should have withdrawn his attention from both mother and child in such emergency and examine for probable errors in the routine duties of his trained assistants would be most unreasonable, if not a negligent act in itself. By the same token, a physician would be required to examine and test the sterile condition of every instrument and the potency of every medicine used by him and supplied by the hospital.
But it is said that the hot water bottles were exposed and uninsulated; that the physician could or should have observed this condition. Again we say that his actions will have to be judged in the light of the circumstances of the moment. The alleged act here was one of omission and occurring in the midst of a grave emergency. The physician had the right to expect the incubator to have been properly conditioned and ready for use. To say the least, he had the right to expect a warning from those responsible if the proper condition did not exist. He testified that he did not examine the incubator; that he did not see the hot water bottles, but that he knew they were being used for heat and expected them to be there, properly tested and insulated. Dr. Wolfe examined and treated the infant immediately after it was placed in the incubator and did not observe the dangerous condition. The most that can be said is that Dr. Mays may not have been ultra cautious, under the circumstances, but we are unable to say that his acts, of both omission and commission, were negligent.
But as aforesaid, the presence of negligence is not necessary for an act to be a superseding cause or an independent intervening act that will relieve the original actor of liability.
A superseding cause or independent intervening act is defined in American Law Institute's Restatement of the Laws of Torts, Section 440, as:
"An act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another, which his antecedent negligence is a substantial force in bringing about."
In the case of Milwaukee and St. Paul Railway Company v. Kellogg, 94 U.S. 469, 24 L.Ed. 256, the Supreme Court of the United States in discussing the application of the rule, states:
"The question always is: was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held, that in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."
Applying these principles, it is our opinion that the act of placing the infant in the incubator by the physician was one to be contemplated and expected when the incubator was conditioned and the very purpose for which it was or should have been prepared, not a superseding or an independent intervening act in any sense. The injuries suffered were the natural and probable consequences of the negligent preparation of the incubator, the failure to speak or act when knowing the presence of danger, all constituting a *Page 371 
continuous succession of events linked together so as to make a natural whole. The act and manner of placing the infant in the incubator was only an innocent and incidental portion of this link and not a new, separate or superseding act.
In the alternative, and as a further defense, defendants urge the doctrine of error of professional judgment as a relief from liability. It is submitted that nursing is a profession for which there are prescribed courses of study and requirements as prerequisite to graduation and practice; that the law relieving from liability, doctors and others who are required to possess special training and skill, applies equally to nurses. That the preparation and application of hot water bottles by a nurse involves professional judgment, and that a sanitarium by whom the nurse is employed is not liable for such an error of judgment. Among the supporting authorities cited are Jordan v. Touro Infirmary et al., La.App., 123 So. 726; Messina v. Societe Francaise, etc., La.App., 170 So. 801.
A determination of this question did not form the basis or grounds for judgment in either of the cited cases. However, in a concurring opinion by a member of the court in the last named case, the question is treated and the opinion expressed that the immunity granted by law for errors or mistakes in the exercise of professional judgment applies equally to nurses and externes; that both cases could have been decided on that ground. This same authority expresses the opinion that the preparation and application of a hot water bottle by a nurse is an act involving the exercise of professional judgment; that the doctrine of respondeat superior would not apply where the skilled employees of a hospital committed errors of professional judgment for the reason that the doctrine is founded on the right to direct and supervise, while the exercise of professional judgment precludes supervision or direction by the hospital. The facts on which these conclusions are based are not similar to those in the case here. The nurse and externe of the Jordan and Messina cases, respectively, were acting under orders of the operating surgeon or attending physician, and not the hospital authorities. In both instances, they exercised their judgment and skill by testing the water used. In both instances, there was error of judgment while exercising their skill. In the case at bar, nurse Smith was performing a routine duty of a hospital not under the order or control of the physician. That the probable performance of this routine duty demanded the exercise of skilled judgment is very true, but, the cardinal wrong and the proximate cause of the injury here was the total absence of the exercise of judgment. Nurse Smith admitted that she neither tested nor insulated the bottles at the time she charged them with hot water and placed them in the incubator. She explains that this act was not for the purpose of conditioning the incubator for instant use, but a preliminary warning before proper adjustment and final preparation. Her action at this stage could not be judged negligence or the proximate cause of the injury. Her careless neglect to make the final preparation and adjustment, coupled with her silence and failure to make known this condition, when danger was apparent, were the negligent acts constituting the proximate cause of the injury. These acts were not errors in the exercise of judgment, professional or otherwise, as none was exercised.
The defendant sanitarium, in this case being a private hospital, the doctrine of respondeat superior, for the reasons aforesaid, is applicable and it is, therefore, liable to plaintiff for the negligence of its employees acting under its direction and control.
After due consideration of the gravity and probable consequences of the injuries suffered, we are unable to say that the quantum of damages awarded by the jury and the judgment of the court below is excessive, under the circumstances. Therefore, we are of the opinion that it should not be disturbed; but, as to the amount of expense bills, we do not agree with the judgment.
Plaintiff alleged that he had paid or was obligated to pay expense bills incurred on account of the baby's burns, in the sum of $1,038.65. This was the aggregate of expenses on account of mother and baby. This amount, according to proven items, was reduced by him to $988.20. He admits that a portion of this aggregate was incurred for attention to and services rendered the mother. In addition to this, it is impossible to determine what part of the expenses incurred on the baby's account is properly chargeable to the burns. It is shown that the mother and infant occupied the same room in the sanitarium for several *Page 372 
weeks and that nurses employed rendered services for this period to each. To illustrate: Dr. Wolfe's bill is $150. It is not shown what his charge would have been had it not been necessary for him to treat the burns.
Plaintiff's counsel recognize the situation to be as above related, but say in brief that of the total of these expenses, two-thirds or $658.80, should be charged to the burns. They are willing that the judgment on this phase of the case be reduced to this amount.
Unless some arbitrary division is adopted it will be necessary to remand the case for additional proof. We feel satisfied that not over one-half of these expenses was occasioned by the burns and have decided to adopt this division as being fair and equitable. Therefore, the judgment in favor of plaintiff, individually, will be reduced in principal to $494.10.
For the reasons herein assigned, the judgment in plaintiff's favor, individually, is amended by reducing the principal thereof to $494.10, and as thus amended, the judgment in all other respects, is affirmed.
HAMITER, J., concurs.
DREW, J., is recused.
TALIAFERRO, J., dissents, and gives written reasons.