144 So.2d 249 (1962)
Glynace H. NORTON et al.
v.
ARGONAUT INSURANCE COMPANY et al.
No. 5601.
Court of Appeal of Louisiana, First Circuit.
June 29, 1962.
Rehearing Denied September 25, 1962.
*250 Taylor, Porter, Brooks, Fuller & Phillips, by F. W. Middleton, Jr., Kantrow, Spaht & Kleinpeter, by Robert L. Kleinpeter, Baton Rouge, for appellants.
H. Alva Brumfield, Baton Rouge, for appellees.
Before LOTTINGER, LANDRY and REID, JJ.
LANDRY, Judge.
Plaintiffs herein, Glynace H. Norton and his wife, Anne Graves Norton, instituted this wrongful death action to recover damages for the accidental demise of their infant daughter, Robyn Bernice Norton, three months of age, who, on January 2, 1960, died in Baton Rouge General Hospital, of an overdose of the drug digitalis administered by injection. Named defendants herein are Argonaut Insurance Company, liability insurer of the Baton Rouge General Hospital; Mrs. Florence Evans, the Registered Nurse who administered the fatal hypodermic; and Aetna Casualty & Surety Company, liability insurer of Dr. John B. Stotler, the attending physician who issued the order for the medication administered by Mrs. Evans. A lengthy trial by jury in the court below resulted in judgment in solido against all defendants *251 in favor of plaintiff, Glynace H. Norton, in the sum of $10,807.35 (including funeral and burial expenses in the sum of $807.35) and in favor of Anne Graves Norton in the amount of $13,000.00. All defendants have appealed and plaintiffs have answered the appeals praying that the awards be increased.
Defendant Aetna Casualty & Surety Company (sometimes hereinafter referred to simply as "Aetna") alleges the judgment against it to be erroneous in that its insured was free of negligence and alternatively contends the awards to plaintiffs herein are excessive and should be reduced. Mrs. Evans and Argonaut Insurance Company (liability insurer of Mrs. Evans' employer, Baton Rouge General Hospital), sometimes hereinafter referred to as "Argonaut") maintain the trial court and jury erred in (1) Finding that Mrs. Evans was guilty of negligence whereas the evidence shows she merely followed the orders of Dr. Stotler and in so doing exercised professional skill and care in keeping with that degree of skill ordinarily employed under similar circumstances by members of the nursing profession in good standing in the same community; (2) concluding that plaintiffs discharged the burden of proving their case by a fair preponderance of the evidence contrary to the law and evidence; and (3) alternatively, that the awards to plaintiff are excessive and should be reduced.
The sequence of events which culminated in the unfortunate and untimely demise of plaintiffs' infant daughter commenced shortly after the child's birth on September 29, 1959. Dr. Charles N. Bombet, the Norton's pediatrician, examined Robyn the day of her birth and attended her subsequently. At birth the child appeared normal but approximately two months thereafter she commenced to exhibit symptoms which prompted the mother to take her to Dr. Bombet for further examination. In early December, 1959, Dr. Bombet detected loud heart murmurs which indicated to him that the child was afflicted with congenital heart disease. At Dr. Bombet's suggestion, Dr. John B. Stotler, Cardiologist, and Dr. Charles Beskin, a specialist in heart surgery, were called in consultation. After examination, Doctors Stotler, Beskin and Bombet, in consultation, agreed that in all probability heart surgery was indicated to correct the congenital deformity noted. It was further agreed that prior to final determination regarding the proposed surgery, additional examination was desirable. With this view in mind, Dr. Stotler admitted the child to Baton Rouge General Hospital December 15, 1959 to conduct further tests and examinations deemed desirable under the circumstances.
On December 15, 1959, Dr. Stotler entered on the physician's order sheet (a hospital form whereon is noted and recorded the doctor's orders and instructions relative to medication and treatment to be given the patient) orders for various drugs including, inter alia, the following:
"Elixir Pediatric Lanoxin 2.5 cc (0.125 mg) q6h X 3 then once daily"
It is conceded by all parties that the foregoing order for medication meant that the patient was to be administered 2.5 ccs of the prescribed drug (known by the trade or brand name of "Lanoxin") every six hours for three doses and once daily thereafter.
There is no dispute that Elixir Pediatrix Lanoxin (hereinafter referred to simply as "Lanoxin") is in reality a derivate of digitalis and that because of its potency it is poisonous if administered in overdoses, therefore, it is to be used with caution and care. It is prescribed in the treatment of certain types of cardiac or heart patients. Briefly stated, the function of the drug is to increase the efficiency or strength of the pumping action of the heart while at the same time reducing the pulse thereby minimizing strain on that most vital organ. In the instant case, it appears that not only was the child's heart congenitally defective but also that her pulse rate was *252 140. According to the record the medicine comes in three forms namely (1) elixir or in alcohol solution which is administered orally or by mouth by means of a calibrated medicine dropper which is supplied with each bottle of the elixir; (2) pill or tablet form (somewhat similar to the common aspirin) which is likewise taken orally and (3) injectible liquid form which is contained in sealed ampules containing two cubic centimers each of the solution and which is administered by injection or hypodermic needle.
There is no dispute among the medical experts who testified herein that a patient who is placed on digitalis must first be "digitalized" which in lay language means the administration of a series of doses (usually three or four) given at intervals of six hours to accustom the patient to the drug and simultaneously attain a desired reaction. When, in the opinion of the attending physician, the patient has been properly digitalized, the patient is then placed on a single daily dose which is referred to in the medical profession as a "maintenance dose" and which, in the absence of an emergency, is administered in oral form.
The manufacturer's recommended dosage for children up to 10 years of age is 0.01 milligrams per pound of body weight every six hours during the digitalization process followed by a daily maintenance dose equal to 0.01 milligrams of the drug per pound of body weight once daily or in divided doses. It is conceded that the daily maintenance dose for the Norton infant was approximately 0.11 considering the record shows that she weighed almost 11 pounds. It likewise appears that in the elixir form 1 cubic centimeter of the elixir contains 0.05 milligrams of digitalis, whereas the injectible type contains 0.25 milligrams per cubic centimeter. The term milligram is employed to indicate the amount of digitalis in either preparation whereas the term cubic centimeter or c.c. denotes merely the volume of the solution in which the drug is contained. From the foregoing it is evident that 3 c.cs. of the elixir contain only 0.15 milligrams whereas 3 c.cs. of the injectible solution contain 0.75 milligrams or five times as much drug. It is conceded that some discretion is permitted the prescribing physician in deviating from or exceeding the manufacturer's recommended dosages dependent upon results achieved with a particular patient. While the exact dosage which the child should have received according to the manufacturer's recommendations was slightly less than 2.5 c.cs. of the elixir, since the child's weight was approximately 11 pounds and 2.5 c.cs. of the elixir contains 0.12½ milligrams, it is acknowledged by all the medical experts that neither the 2.5 c.cs. prescribed by Dr. Stotler as the daily maintenance dose nor the 3 c.cs. prescribed January 2, 1960, for one dose only was excessive or would have in any way harmed the child if administered in the elixir form. There is, however, some dispute among the medical experts regarding the effect of a double dose of 3 c.cs. of the elixir administered within a period of approximately one hour. All the experts agree, however, that 3 c.cs. administered intramuscularly is a fatal overdose for a 3 month old infant as was most tragically demonstrated in the case at bar.
The principle difference between the route selected for administration of the drug, that is, whether it be given orally or by injection, appears to be the reaction time or time in which it is absorbed by the system and the patient begins to derive benefit therefrom. Almost immediate results are obtained by intravenous injection (injection directly into the veins) for the reason that the medication is inducted directly into the blood stream. The slowest route is by way of mouth for the medication must first be absorbed or assimilated by the blood stream and then carried through the body. Intramuscular injection (injection into a muscle) though slower than the intravenous route is more rapid than oral administration. It further appears with reasonable certainty that taken orally the drug loses some of its potency in the process of being absorbed *253 into the blood stream and that 0.15 milligrams of the oral form (elixir or tablet) will not produce quite as much net result or effect on the patient as 0.15 given intramuscularly.
The third of the three digitalization doses ordered by Dr. Stotler on December 15, 1959 was not timely administered by the nursing staff whereupon Mrs. Norton who remained with her child while the infant was in the sanitarium, became concerned and requested and was granted permission by Dr. Stotler to thereafter administer the daily maintenance dose of 2.5 c.c. which Dr. Stotler prescribed. Dr. Stotler instructed Mrs. Norton in the use of the calibrated medicine dropper by means of which the medicine is administered and thereafter Mrs. Norton herself gave the medication daily.
The child was discharged from the hospital December 16, 1959, and returned home to await the scheduling of the surgery which was to be performed soon thereafter.
On December 28, 1959, Dr. Bombet found on examination that the child's condition had apparently worsened. He noted that the baby had a cough, was feverish and appeared to be losing weight. Since the medication then being administered did not appear to be improving the child to any extent, he considered it necessary to return the infant to the hospital the following day and consequently, on December 29, 1959, Dr. Bombet readmitted the child to the hospital. On this occasion he issued admission orders on the infant to be placed in the child's hospital chart or record. Included in his admission orders were instructions regarding medication, diet, etc., and the notation that special medication was being administered by the mother. In this connection it appears that Mrs. Norton preferred to continue administration of the daily maintenance dose of the lanoxin herself since she had been performing this function since the child's initial admission to the hospital on December 15th. Dr. Bombet noted in the hospital admission orders of December 29, 1959, that special medication was being given by the mother to thusly advise the hospital staff and employees that some medication was being administered the child other than that which he placed on the order sheet and would, therefore, be administered by the hospital nursing staff.
On January 2, 1960 (Saturday) Dr. Stotler examined the Norton baby at approximately noon while in the course of making his rounds in the hospital. As a result of this examination he concluded that the child needed an increase in the daily maintenance dose of lanoxin and instructed Mrs. Norton, who was present in the room, to increase the daily dose of the lanoxin for that day only to 3 c.cs. instead of the usual 2.5 c.cs. Following this instruction to Mrs. Norton, Dr. Stotler went to the nurse's station in the hospital pediatric unit floor to check the hospital chart or record on the Norton infant and noted on the Doctor's Order Sheet contained therein certain instructions among which only the following is pertinent to the issues involved herein: "Give 3.0 cc lanoxin today for 1 dose only".
Dr. Stotler's entry of the foregoing order for medication constitutes the basis of plaintiff's claim against Aetna as the professional liability insurer of Dr. Stotler. It is frankly conceded by Aetna that unless Dr. Stotler indicated on the order sheet that he had instructed the patient's mother to increase the daily maintenance dose of lanoxin to 3.0 c.cs. and administer the medication, his entry of the aforesaid prescription on the order sheet would indicate that the nursing staff of the hospital was to give the medication prescribed. It is further conceded that under such circumstances the child was subjected to the possibility of being administered a second dose of lanoxin. The possibility thus presented is exactly what occurred in the instant case. A member of the nursing staff noting Dr. Stotler's orders to administer the 3 c.cs. of lanoxin for 1 dose only administered 3 c.cs. of lanoxin in its injectible form instead of the elixir form which Dr. Stotler intended. The importance of this difference *254 in the form of the medication has hereinbefore been shown. It is readly conceded by all concerned that the 3 c.cs. of lanoxin administered the baby by hypodermic was a lethal overdose and was in fact the cause of the infant's demise.
The salient issue in the instant case is whether or not the order for lanoxin as written by Dr. Stotler on the order sheet under date of January 2, 1960, indicated that the lanoxin should be administered orally (as this child had been administered this medication in the past) or whether his instruction as worded indicated that the injectible form of lanoxin would be given hypodermically. In this connection it is desired to state that both the elixir and injectible form of lanoxin are measured in terms of cubic centimeters. The positions of the respective defendants may be stated as follows:
Mrs. Evans and Argonaut maintain that the failure of Dr. Stotler to designate the route of administration was responsible for administration of injectible lanoxin instead of elixir orally because the order as written indicated the route to be intramuscularly by hypodermic. On the other hand, Dr. Stotler's insurer, Aetna, contends in substance that the order was written according to the custom and practice of other physicians in the same field in the same locality and that in the event of any uncertainty concerning the order, it was the duty of the hospital employees to make sufficient inquiry to determine which type of administration was intended.
It is readily admitted by Dr. Stotler in his testimony appearing in the record that he was in error in failing to note on the order sheet that the 3 c.cs. of Lanoxin ordered January 2, 1960, for one dose only, had already been given by the mother or was to be administered by her because, without such explanation it was the duty of the hospital nursing staff to administer the medication. Aetna maintains, however, that this admitted oversight on the part of its insured subjected the infant to the possibility of a double oral dose only which would not have been fatal. In this regard, Aetna advances the following arguments: (1) The order as written meant and intended that the drug prescribed be given orally by mouth for the reason that it is the custom, practice and understanding in hospitals in the community that drugs prescribed on a hospital order sheet are to be administered orally or by mouth unless otherwise indicated by the doctor prescribing same; (2) In the event of ambiguity or uncertainty regarding medication prescribed it is the duty of the nurse administering the drug to call the attending physician for the purpose of clarification which admittedly was not done by the nurse who administered the fatal dose; and (3) That purpose and effect of Lanoxin is so well known to the medical and nursing professions it is inconceivable that any registered nurse would interpret an order thusly written to call for administration of what should be readily recognized as a lethal dose for a 3 month old infant, consequently such gross negligence on the part of the nurse in question constitutes an independent intervening cause relieving the physician of all liability. Stated otherwise, it is contended on behalf of Aetna that such gross negligence on the part of Nurse Evans is so incomprehensible, unforeseeable and inconceivable as to render the negligence of Dr. Stotler, if any, a remote rather than a proximate cause of the child's death.
The date of the tragedy with which we are here concerned, namely, January 2, 1960, was a Saturday. The nurse in charge of the pediatric unit, Miss Joan Walsh, a Registered Nurse, was absent from the hospital because it was her day off. The pediatric unit was in charge of Miss Barbara Jean Sipes, a Registered Nurse, who was assisted by a nurse's aid. Mrs. Florence Evans, Assistant Director of Nursing Service was the Senior Nurse on duty at the hospital at the time and in such capacity, exercised complete supervision and control of all nurses. Her duties were primarily administrative and supervisory. However, the rules of the institution required that *255 when necessary she render assistance to the nurses on duty and perform routine nursing services. In addition, in the course of checking the operation of the numerous departments and units of the hospital (making the rounds, as it is referred to) Mrs. Evans went to the pediatric unit sometime after the lunch hour and discovered that the only Registered Nurse on duty, Miss Sipes, was quite busy with an emergency patient brought to the hospital and being attended by a Dr. Ruiz. Observing that the pediatric unit was in need of additional nurses under the circumstances shown, Mrs. Evans summoned a senior student nurse, Miss Meadows, to the pediatric unit from another department and Mrs. Evans herself remained in the unit for a time. In checking the charts of the patients on the unit, Mrs. Evans noted the order which Dr. Stotler had that day previously entered on the chart of the Norton baby including the prescription for 3 c.cs. of Lanoxin for one dose only.
The evidence discloses that although Mrs. Evans is a registered nurse with many years experience it also appears that for the past several years her employment as a nurse has been principally in an administrative or supervisory capacity. It further appears that although Lanoxin in elixir preparation (in which form it can only be administered orally) had been available for a number of years, Mrs. Evans was not aware that the drug was manufactured in solution to be given orally. Because she had not practiced nursing as such for the past few years her knowledge of and familiarity with the drug in question was limited to the medicine as an injectible to be given only by hypodermic needle.
Noting that Dr. Statler had orderd 3 c.cs. Lanoxin be given the Norton infant in one dose for that day only and knowing that it was the duty of the nursing staff to administer the medication, Mrs. Evans made inquiry and learning that the prescribed drug had not been administered decided to give the medication herself. She at no time considered administration of the drug other than by injection since by her own admission she was not then aware that Lanoxin came in elixir form. However, despite her limited knowledge of the drug, her training and womanly intuition warned her that 3 c.cs. of Lanoxin given by injection to a 3 month old infant appeared to be a rather large dose. She discussed the matter very briefly with the student nurse, Miss Meadows, and inquired of the Registered Nurse, Miss Sipes, whether or not the child had previously received Lanoxin. Mrs. Evans then examined the patient's hospital chart and found nothing therein which indicated the child had been receiving Lanoxin while in the hospital. In this regard, however, her testimony is vigorously disputed by defendant Aetna. Considering administration of the drug only by hypodermic needle, Mrs. Evans, accompanied by the Student Nurse, Miss Meadows, went to the medicine room of the pediatric unit and obtained two ampules of Lanoxin each containing 2 c.cs. of the drug in its injectible form. While pondering the advisiability of thusly administering what she considered to be a large dose, Mrs. Evans noted that Dr. Beskin, one of the consultants on the child's case, had entered the pediatric ward so Mrs. Evans consulted him about the matter and was advised that if Dr. Stotler prescribed 3 c.cs. he meant 3 c.cs. Still not certain about the matter Mrs. Evans also discussed the subject with Dr. Ruiz and was informed by him in effect that although the dose was the maximum dose that if the doctor had prescribed that amount she could give it. The foregoing inquiry having satisfied Mrs. Evans' suspicions about the matter, Mrs. Evans then obtained a syringe, extracted 3 c.cs. of the medicine from the two ampules and injected one-half thereof into each buttock of the child. Following the injection Mrs. Evans noted on the chart that she administered the drug intramuscularly at 1:30 P.M. The injections upset the baby causing her to cry. Mrs. Norton then requested a hot water bottle to place on the baby's buttocks to alleviate the pain occasioned by *256 the injections and was advised that such could not be obtained without the orders of the attending physician. Mrs. Norton then called Dr. Stotler and in the course of the conversation mentioned that the child had received additional medication by injection. Dr. Stotler immediately called the nurses' station of the pediatric unit and upon learning of the administration of the lethal dose of injectible Lanoxin issued emergency orders and summoned Doctors Bombet and Beskin. Despite all emergency measures, including opening the child's chest and massaging her heart, the infant died at 2:45 P.M., approximately one hour and 15 minutes following the fatal injection.
Except as hereinafter noted, the above recitation of the chronology of event culminating in this litigation is, in the main, undisputed. There are some areas of disagreement between the witnesses and contending parties as hereinafter noted.
Mrs. Florence Evans, a Registered Nurse with many years experience and highly regarded by members of her own and the medical profession, testified that for the past number of years she has held mostly executive and administrative or supervisory positions in numerous hospitals including the Baton Rouge General Hospital. In such capacity most of her services are performed in the nursing service office rather than on the floor at a nursing station although she does incidentally perform nursing services while in the course of making her rounds in a supervisory capacity as occurred on the day of the accident in question.
By her own admission Mrs. Evans on the day in question was the Senior Nurse on duty and, as such, in complete charge and control of all nurses in the institution. She likewise frankly admits that she was not familiar with all forms of the drug Lanoxin and while acquainted with the medicine in a general way she was not aware that it came in elixir form and so far as she knew Lanoxin was prepared only as an injectible. Mrs. Evans frankly conceded that at no time did she consider any route of administration other than by hypodermic needle. Both she and certain other nurses who testified stated that they were of the impression that drugs measured in cubic centimeters were intended to be given by injection. It occurring to her that 3 c.cs. appeared to be a rather large dose she made the inquiries herein previously noted. Her version, however, as to her conversations with Drs. Beskin and Ruiz do not accord with that of said doctors. According to Mrs. Evans while she was considering the dosage, Dr. Beskin entered the pediatric unit and sat at the table where the charts are kept. She stated that accompanied by the Student Nurse, Miss Meadows, she took the two ampules of injectible Lanoxin which she had secured from the medicine room, placed them and the chart on the table before Dr. Beskin and inquired, "Does he really mean to give this", or words to that effect whereupon Dr. Beskin replied: "If that's what he said, that's what he meant to give." Mrs. Evans then turned and walked toward the nearby medicine room where she encountered Dr. Ruiz who had come in with a patient. She handed Dr. Ruiz one of the two ampules she carried and asked him about the dosage. According to Mrs. Evans, Dr. Ruiz responded that "it is a large dose". She then asked Dr. Ruiz if he would give this dose to a small child to which he replied "I suppose I would." She denied that the doctor's progress notes which appear on the child's chart and which indicated the child was on oral Lanoxin was in the record at the time. In this connection she testified that such notes are dictated by the attending physician into a recording machine in the hospital room and are typed and placed in the record after the patient's discharge. She likewise denied that the order sheet on the child's prior admission was in the record. According to Mrs. Evans nothing in the chart or record indicated to her that an oral route was intended.
Dr. Beskin testified that when Mrs. Evans consulted him about the dosage to be given *257 the child he had no idea she intended administering the drug by injection. He was familiar with the fact that the child was on maintenance digitalis and knew that maintenance dosage was never given hypodermically except in cases of extreme emergency when immediate results are desired. He positively denied that Mrs. Evans showed him the ampules of injectible Lanoxin and denied seeing them although he concedes she might have had the ampules in her hand without his having seen them. He further stated he was well aware that a 3 c.c. injection of Lanoxin would be fatal to such a small child. Dr. Beskin also testified that he was clearly of the impression Mrs. Evans was referring solely of the quantity to be administered and at no time was he led to believe she desired information about the method or route of administration. If he had even remotely suspected that she referred to the drug in its injectible form he would have warned her. His testimony clearly shows that, because of the nature of the drug, in his opinion, the better practice is to specify the route or method of administration on the order sheet. His testimony is devoid of reference to any custom or practice to the effect that if route of administration is not specified it signifies the drug is to be given orally.
Dr. Ruiz's testimony is also somewhat in conflict with that of Mrs. Evans as to what conversation transpired between them. According to Dr. Ruiz, Mrs. Evans, standing in the doorway to the medicine room, showed him an ampule of Lanoxin and asked him about it. From Mrs. Evans' inquiry Dr. Ruiz understood that she had been ordered to administer the medication hypodermically and was of the further impression that her inquiry was whether 1 c.c. of the drug given by injection was excessive. He told her that in one dose, it (he referring to "it" as a c.c. by injection) was a large dose for an infant and that it would be better for Mrs. Evans to consult the attending physician who wrote the order. According to Dr. Ruiz, he then obtained the medicine which prompted his visit to the medicine room and left. Dr. Ruiz testified positively that it is the policy for nurses to call the attending physicians when there is doubt or uncertainty about an order for medication. He also stated that in his own experience he has been called numerous times by nurses who desired explanation or clarification of his orders. Dr. Ruiz did not testify regarding the alleged custom or understanding that orders for medication are intended to be by oral route unless otherwise specified. He did testify, however, that in his opinion, the better practice is to specify both route and amount of any drug prescribed. The testimony of Dr. Ruiz makes it quite clear that in his opinion, a nurse who is unaware of the fact that Lanoxin is prepared in oral form is not properly trained and instructed for duty in a pediatric ward.
Dr. Charles N. Bombet, Pediatrician, in substance testified that in his opinion, the better practice and the procedure which he always followed was to specify the route of administration when the drug prescribed was capable of administration by multiple route. He further testified that the nature and potency of Lanoxin is such that even though he prescribes the drug rather frequently in his practice he does not trust to memory with respect to dosages but instead carries upon his person at all times a pocket sized manufacturer's chart furnished physisians. Dr. Bombet also testified that he never prescribes the drug without referring to the chart in question to determine dosage. He stated that it is his practice to always indicate in some manner the route of administration he intends. As did the other medical experts he also testified that it is the custom and practice for nurses who are in doubt regarding a physician's order to consult the physician who wrote the order.
Jimmie Dean Westbrook, a registered nurse, testified in substance that if she had read Dr. Stotler's order of January 2, 1960, to give 3 c.c. of Lanoxin today for one dose only, she does not know how she would have interpreted it at that time. She was, *258 however, familiar with Lanoxin in its elixir form and had forgotten that she had administered the elixir to the Norton infant when the baby was first hospitalized. According to Westbrook, her policy is that when in doubt about an order for medication she calls the attending physician.
Mrs. Helen W. Sheehan, Director of Nursing Services, Baton Rouge General Hospital, testified that since the incident involving the Norton baby she has instituted a rule in the hospital that all nurses must indicate on the chart by means of a system of symbols the route of administration of all drugs and that nurses are to assume the route to be oral unless otherwise specified by the attending physician. Mrs. Sheehan is of the opinion that the better practice (which she follows) is that in case of doubt the attending physician should be contacted regarding an order for medication. She declined to testify that it was the general practice in the nursing profession to assume that where route was not specified oral administration was intended. She had been taught that oral route was intended unless otherwise specified but did not know what was taught on the subject as a general rule although she conceded that some books on Pharmacology advocated the practice of oral administration in the absence of specific orders to the contrary. To her knowledge the hospital never adopted a policy as to what course a nurse should follow in the event of doubt concerning an order for medicine. In her own case Mrs. Sheehan followed what she considered the better practice of consulting the attending physician in case of uncertainty.
Miss Shirley M. Meadows, student nurse on duty in the pediatric ward January 2, 1960, in substance corroborated the testimony of Mrs. Evans relative to the latter's conversations with Doctors Beskin and Ruiz. She denied that in her nurse's training she was taught that when route of administration was not specified oral administration of medication was intended. She likewise denied knowledge of any rule, custom or practice in the hospital to the effect that where route was not mentioned oral administration was presumed to be the route intended. According to Miss Meadows what is usually done in such instances is that the nurse relies upon her knowledge of the medication and experience gained from prior administration of the particular drug. She further testified that the normal procedure in instances of doubt is to call either the hospital pharmacy or the physician who prescribed the medication to be administered a patient.
Miss Barbara Jean Sipes, the registered nurse in charge of the Pediatric unit on the day in question, in essence testified that she heard nothing of the conversation between Mrs. Evans and Dr. Beskin although she did see them talking. She heard at least a portion of the discussion between Mrs. Evans and Dr. Ruiz but did not hear Dr. Ruiz advise Mrs. Evans to call the attending physician. According to Miss Sipes, Mrs. Evans discussed the problem with her and the manner in which the disputed order was written led both Miss Sipes and Mrs. Evans to believe and understand that the medication was intended to be routed intramuscularly. She stated that designation of the quantity in cubic centimeters to her meant injection. Upon her memory being refreshed from information on the child's hospital chart, she recalled having administered the infant Lanoxin orally on the baby's previous hospitalization but commented that at that time it was prescribed "Elixir" which was different from the order of January 2, 1960. Until just a few days prior to trial of this case she had never heard that oral administration was meant and intended unless otherwise specified. She was taught, considered it the best practice and followed the rule of consulting the prescribing physician when in doubt about an order for medication.
Miss Joan O. Walsh (the nurse in charge of the Pediatric Unit) testified that she was off duty on the day in question. When queried about the order in question she repeatedly testified that because of the manner in which it was written she does not *259 know exactly how she would have interpreted it at the time. She intimated, however, that in view of her familiarity with Lanoxin and the fact that she had previously administered oral Lanoxin to the Norton child on the baby's prior admission to the hospital she might have understood the order to intend oral route.
The rule applicable in the instant case is well stated in the following language appearing in Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781:
"(1) A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S. Physicians and Surgeons § 41.
See also Favalora v. Aetna Casualty & Surety Company, et al., Number 5575, on the docket of this court rendered this day and reported in 144 So.2d 544.
From the foregoing resume of the testimony appearing in the record of this case it is manifest that Dr. Stotler was negligent in failing to denote the intended route of administration and failing to indicate that the medication prescribed had already been given or was to be given by the patient's mother. It is conceded by counsel for Dr. Stotler that the doctor's oversight in this regard exposed the child to the distinct possibility of being given a double oral dose of the medicine. Although it is by no means certain from the evidence that a second dose of oral Lanoxin would have proven fatal, Dr. Stotler's own testimony does make it clear that in all probability it would have produced nausea. In this regard his testimony is to the effect that even if the strength of two oral doses were sufficient to produce death in all probability death would not result for the reason that nausea produced by overdosing would have most probably induced the child to vomit the second dose thereby saving her life.
The contention that Dr. Stotler followed the practice and custom usually engaged in by similar practitioners in the community is clearly refuted and contradicted by the evidence of record herein. Of the four medical experts who testified herein only Dr. Stotler testified in effect that it was the customary and usual practice to write a prescription in the manner shown. The testimony of Drs. Beskin, Bombet and Ruiz falls far short of corroborating Dr. Stotler in this important aspect. The testimony of Dr. Stotler's colleagues was clearly to the effect that the better practice is to specify the route of administration intended. Doctors Beskin and Bombet further testified that in their own practice they follow the procedure of indicating in some manner what method of administration they desire. In this connection we note the hereinabove mentioned testimony of Dr. Bombet to the effect that Lanoxin being such a potent and highly specialized drug, he at all times carries on his person a pocket chart provided by the manufacturer for use by physicians and always consults the chart before prescribing dosage rather than rely upon his memory. While it is conceded his testimony in this respect clearly shows that he consults the chart merely to refresh his memory as to dosage, it nevertheless indicates the importance which he attaches to the necessity of being accurate when dealing with this particular medication. In view *260 of the foregoing, we hold that the act acknowledged by Dr. Stotler does not relieve him from liability to plaintiffs herein on the ground that it accorded with that degree of skill and care employed, under similar circumstances, by other members of his profession in good standing in the community. We find and hold that the record before us fails to establish that physicians in good standing in the community follow the procedure adopted by defendant herein but rather the contrary is shown.
Pretermitting the issue of charitable immunity (with which we are not herein concerned in view of the fact that the suit is against the insurer of the hospital in the instant case) it is the settled jurisprudence of this state that a hospital is responsible for the negligence of its employees including, inter alia, nurses and attendants under the doctrine of respondeat superior. Cornell v. United States Fidelity & Guaranty Co., et al., La.App., 8 So.2d 364.
In the case at bar it is not disputed that Mrs. Evans was not only an employee of the hospital but that on the day in question she was in charge of the entire institution as the senior employee on duty at the time.
Although there have been instances in our jurisprudence wherein the alleged negligence of nurses has been made the basis of an action for damages for personal injuries resulting therefrom, we are not aware of any prior decision which fixes the responsibility or duty of care owed by nurses to patients under their care or treatment. The general rule, however, seems to be to extend to nurses the same rules which govern the duty and liability of physicians in the performance of professional services. Thus in Volume 70 C.J.S. Verbo, Physicians and Surgeons, § 41, page 946 we find the rule stated as follows:
"* * * The same rules that govern the duty and liability of physicians and surgeons in the performance of professional services are applicable to practitioners of the kindred branches of the healing profession, such as dentists, and, likewise, are applicable to practitioners such as drugless healers, oculists, and manipulators of X-ray machines and other machines or devices."
The foregoing rule appears to be well founded and we see no valid reason why it should not be adopted as the law of this state. Tested in the light of the rule hereinabove enunciated the negligence of Mrs. Evans is patent upon the face of the record. We readily agree with the statement of Dr. Ruiz that a nurse who is unfamiliar with the fact that the drug in question is prepared in oral form for administration to infants by mouth is not properly and adequately trained for duty in a pediatric ward. As laudable as her intentions are conceded to have been on the occasion in question, her unfamiliarity with the drug was a contributing factor in the child's death. In this regard we are of the opinion that she was negligent in attempting to administer a drug with which she was not familiar. While we concede that a nurse does not have the same degree of knowledge regarding drugs as is possessed by members of the medical profession, nevertheless, common sense dictates that no nurse should attempt to administer a drug under the circumstances shown in the case at bar. Not only was Mrs. Evans unfamiliar with the medicine in question but she also violated what has been shown to be the rule generally practiced by the members of the nursing profession in the community and which rule, we might add, strikes us as being most reasonable and prudent, namely, the practice of calling the prescribing physician when in doubt about an order for medication. True, Mrs. Evans attempted to verify the order by inquiring of Doctors Beskin and Ruiz but evidently there was a complete lack of communication with these individuals. The record leaves no doubt but that neither Doctor Beskin nor Doctor Ruiz was made aware of just what Mrs. Evans intended to administer. Dr. Beskin was of the impression she referred to oral Lanoxin and Dr. Ruiz was of the impression she *261 intended only 1 cubic centimeter of the injectible. For obvious reasons we believe it the duty of a nurse when in doubt about an order for medication to make absolutely certain what the doctor intended both as to dosage and route. In the case at bar the evidence leaves not the slightest doubt that whereas nurses in the locality do at times consult any available physician, it appears equally certain that all of the nurses who testified herein agree that the better practice (and the one which they follow) is to consult the prescribing physician when in doubt about an order for medication. With regard to nurses consulting any available physician when in doubt about an order for medication, the testimony of Drs. Beskin and Ruiz indicates clearly that in their experience such inquiries are generally restricted solely to interpretation of the doctor's handwriting and are not usually related to dosage or route. Having elected to deviate from the general and better practice of consulting the physician who ordered the medication in question, Mrs. Evans was under the duty and obligation of making herself understood beyond the possibility of error. This she did not do as has herein previously been shown. It appears reasonably clear that had she consulted Dr. Stotler and advised him of her intention to administer the 3 c.cs. of Lanoxin hypodermically he would have warned her of the danger and this tragic accident would not have occurred.
Aetna's defense predicated on the ground that because the negligence of the nurse was so inconceivable, gross and unpredictable as to constitute an independent intervening cause thereby relieving its insured of liability is without merit under the facts of the instant case.
The evidence in the case at bar leaves not the slightest doubt that when Dr. Stotler entered the order for the medication on the chart, it was the duty of the hospital nursing staff to administer it. Dr. Stotler frankly concedes this important fact and for that reason acknowledged that he should have indicated on the chart that the medication had been given or was to be given by the mother, otherwise some nurse on the pediatric unit would give it as was required of the hospital staff. Not only was there a duty on the part of Dr. Stotler to make this clear so as to prevent duplication of the medication but also he was under the obligation of specifying or in some manner indicating the route considering the drug is prepared in two forms in which dosage is measured in cubic centimeters. In dealing with modern drugs, especially of the type with which we are herein concerned, it is the duty of the prescribing physician who knows that the prescribed medication will be administered by a nurse or third party, to make certain as to the lines of communication between himself and the party whom he knows will ultimately execute his orders. Any failure in such communication which may prove fatal or injurious to the patient must be charged to the prescribing physician who has full knowledge of the drug and its effects upon the human system. The duty of communication between physician and nurse is more important when we consider that the nurse who administers the medication is not held to the same degree of knowledge with respect thereto as the prescribing physician. It, therefore, becomes the duty of the physician to make his intentions clear and unmistakable. If, as the record shows, Dr. Stotler had ordered Elixir Lanoxin, or specified the route to be oral, it would have clearly informed all nurses of his intention to administer the medication by mouth. Instead, however, he wrote his order in an uncertain, confusing manner considering that the drug in question comes in oral and injectible form and that in both forms dosage is prescribed in terms of cubic centimeters.
It is settled jurisprudence of this state that where the negligence of two persons combines to produce injury to a third, the parties at fault are liable in solido to the injured plaintiff. Abrego v. Tri-State Transit Co., La.App., 22 So.2d 681; Huguet *262 v. Louisiana Power & Light Co., 196 La. 771, 200 So. 141; LSA-C.C. Article 2324.
The doctrine of independent, intervening cause invoked by defendant Aetna herein on the ground that conceding Dr. Stotler's negligence, the independent, intervening negligence of Mrs. Evans was so unforeseeable and unpredictable as to render Dr. Stotler's negligence a remote rather than a proximate cause of the child's death is without foundation in the record.
In the most recent pronouncement on the subject matter, the Supreme Court of this state in Dixie Drive-It-Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298, the rule is stated as follows:
"The inquiry as to whether a defendant should be relieved of liability because of the intervening negligence of another is frequently couched in terms of proximate cause. In the instant case the Court of Appeal concluded that the defendants should be relieved of liability based upon the following statement of law:
"`Whatever negligence may have been involved on the part of the driver of the defendant vehicle had become passive and too remote to be a contributing cause of the accident. The sole proximate cause thereof was the negligence of the driver of the plaintiff truck. The defendant is not liable because the negligence of its employee-driver was not a proximate cause of the accident.'
"The thrust of this formulation of law is toward relieving all but the last wrongdoer of liability to an innocent victim in torts involving intervening negligence. This restrictive doctrine finds little support in legal theory. We do not subscribe to the formulation as applied in this case.
"The essence of the present inquiry is whether the risk and harm encountered by the plaintiff falls within the scope of protection of the statute. It is a hazard problem. Specifically, it involves a determination of whether the statutory duty of displaying signal flags and responsibility for protecting traffic were designed, at least in part, to afford protection to the class of claimants of which plaintiff is a member from the hazard of confused or inattentive drivers colliding with stationary vehicles on the highway.
"In Maggiore v. Laundry & Dry Cleaning Service, Inc., La.App., 150 So. 394, the Court of Appeal, with Judge Janvier as its organ, defined the scope of protection of the traffic ordinance violated and imposed liability on the violator with the following analysis:
"`We cannot avoid the conclusion that there was what may be called primary or initial negligence on the part of defendant's driver. Section 14, article III, of the traffic ordinance was inserted so that such accidents might be made practically impossible. The possibility of such unexpected dangers was in the contemplation of the framers of the ordinance. They realized that the mere application of the brake and the mere cutting off of power might render the possibility of such an accident very remote, but that, nevertheless, there would remain the possibility, so long as the starting key should remain in its place in the vehicle, and they, therefore, required that the key be withdrawn. It cannot be said that there was no causal connection between the fact that the key was left in place and the fact that later the motor started. A violation of a statute enacted for the safety of life or limb necessarily has the relationship of cause to effect where the final effect is such as could not have occurred had the statute not been violated.'
"In Butts v. Ward, 227 Wis. 387, 279 N.W. 6, 116 A.L.R. 1441, the court, in *263 discussing the scope of protection of a traffic statute, stated:
"`* * * Whenever the Legislature enacts a safety statute, it declares that injury from violation of it is reasonably to be anticipated. The Legislature establishes the standard of care to be exercised and liability for injury resulting from violation of the standard follows.'
"In 38 Am.Jur., Negligence, § 167, p. 841, the rule is succinctly stated as follows:
"`* * * The general principle is that the violation of a statute or ordinance is not rendered remote as the cause of an injury by the intervention of another agency if the occurrence of the accident, in the manner in which it happened, was the very thing which the statute or ordinance was intended to prevent.'
"In a scholarly article entitled `Proximate Cause in Louisiana' by Jesse D. McDonald, 16 Louisiana Law Review 391, the principle is stated as follows:
"`* * * Since the law never gives absolute protection to any interest, recovery will be allowed only if the rule of law on which plaintiff relies includes within its limits protection against the particular risk that plaintiff's interests encountered. This determination of the particular risks to plaintiff that fall within the ambit of protection of the rule of law on which plaintiff relies is the determination of the issue of proximate cause.'
* * * * * *
"`The presence of causes intervening subsequent to defendant's act which brings about injury presents no special problem. In such cases, the inquiry of the court is simply whether the risk produced by the combination of defendant's act and the intervening cause is one which is within the scope of protection of the rule of law upon which plaintiff relies.'
"To the same effect see Green, Rationale of Proximate Cause, pp. 142-144."
In the Dixie Drive-It-Yourself case, supra, the Supreme Court further held that negligent conduct constitutes a substantial factor in bringing about injury if the injury would not have occurred without it. Although, in our opinion, the holding in Dixie Drive-It-Yourself, supra, appears to depart somewhat from the generally accepted rule of foreseeability, we believe that either under the foreseeability rule or the rule announced in the Dixie Drive-It-Yourself Case, supra, the doctrine of independent, intervening cause is unavailable to defendant Aetna in the case at bar. That the negligence of Dr. Stotler was a substantial factor in bringing about the death of the Norton child appears so obvious as to warrant little discussion. In this connection we believe it suffices to say that if the order had been written so that it could be clearly understood the untimely death of the child would not have resulted therefrom. Moreover, it appears from the testimony of at least two of the nurses who testified herein that prescribing the drug in cubic centimeters indicated to them that it was to be administered by intramuscular injection. We believe it safe to say that except for the manner in which the prescription was written, the accident upon which this litigation is predicated would not have occurred.
Moreover, however, what appears to us to be the more logical conclusion is that the negligence of Aetna's insured foreseeably produced the death of plaintiff's child. We believe the testimony of Doctors Bombet and Beskin make it clear that the better practice is to specify the route of administration to avoid the possibility of error in dealing with a drug of the nature and character with which we are herein concerned. Failure to specify the route of a drug which, measured in c.cs. may be administered *264 either orally or by injection is, in our view, calculated to produce confusion and uncertainty which may foreseeably result in the drug being administered in either form one of which may prove fatal. Misinterpretation of the order as written being foreseeable under the circumstances, such misconstruction cannot serve as the basis of rendering the physician's negligence remote rather than proximate. Rather than being incomprehensible and inconceivable as defendant Aetna contends, it appears such misconstruction is foreseeable and likely under the circumstances shown in the case at bar.
We believe the awards allotted to plaintiffs herein are excessive in view of the prior jurisprudence. As was recently stated by this court in Little v. Hughes, La.App., 136 So.2d 448, awards made in similar cases for personal injuries are so considered that within the limits prescribed by the facts of each individual case, a degree of uniformity will be maintained so that recoveries will not be out of all proportion with one another. While we concede the foregoing principle was stated in a case involving personal injuries to an adult the rationale of the rule is equally applicable in wrongful death cases.
On the issue of quantum defendants have directed our attention to Meaux v. Gulf Ins. Co., et al. (1938), First Circuit, La.App., 182 So. 158, and Todd et ux. v. New Amsterdam Cas. Co. (1951) Fourth Circuit (Formerly Orleans), La.App., 52 So.2d 880. In the Meaux case, supra, in awarding the parents of a three and one-half month old infant the sum of $1,500.00 each for the death of their infant son, the court, inter alia, made the following pertinent observations:
"It seems as though this is the first time this court or any of the appellate courts in this state is called on to assess damages for the death of an infant three and a half months old. Any court hesitates when it has to measure the value of human life in money. In suits for damages for death of children a few years of age, there are enough cases to look to to furnish some sort of a guide. We are not unmindful of the suffering which a mother has to undergo in order to bring her new born child into the world and of the deep anxiety of the father, and still we can not but feel that parents have not the same form of attachment for a three months old baby that they have for a child three years or more. At such a tender age, the hazard of life has not yet been overcome as much as it has in the older child. The small infant is subject to so much more disease and other perils of life than the one who is past the infant age and may be said to be safely on the road to life. That may be one of the reasons why that attachment and devotion of the parent, which we have referred to, increases as the child grows older. That is the reason also why we believe that compensation for the death of an infant of the age of the one whose loss was sustained in this case, should not be as great as in the case of an older child, and therefore we have concluded to assess the damages in this case at the sum of $3,000.00 allowing one-half of that amount to each of the parents."
In the Todd case, supra, parents were allotted damages in the sum of $3,750.00 each for the death of their three and one-half year old daughter. Admittedly awards in personal injury and death actions have increased during the past few years to compensate for the decreasing purchase price of the dollar.
Although learned counsel for plaintiffs-appellees has answered the appeal praying for an increase in the awards received, he has cited no authority on which an increase could be predicated.
We are not herein concerned with the loss of an only child by a couple incapable of producing additional offspring due to the *265 age factor or other causes. The record reveals Mr. Norton's age to be 40 years but is silent as to the age of Mrs. Norton. Fortunately for plaintiffs herein they are blessed with three remaining healthy, normal children upon whom they may lavish some of the affection which they unquestionably would have extended the deceased infant. Insofar as the present record is concerned it may well be that they are capable of having additional children although we concede this latter observation to be purely conjectural. At least their inability to have additional children is not shown in the record. We readily acknowledge that the remaining children cannot compensate for the loss of little Robyn only render plaintiffs' loss less tragic and their grief more consolable.
In view of the awards in the Meaux and Todd cases, supra, (the only cases which we have been cited or can find on the question of an award of damages for the death of an infant) we conclude that the awards should be reduced to the sum of $5,000.00 for plaintiff Glynace H. Norton and $5,000.00 for plaintiff Anne Graves Norton. In addition, plaintiff Glynace H. Norton is, of course, entitled to special damages in the sum of $807.35 awarded by the lower court.
It is common knowledge that attachment to a child becomes progressively more intense and pronounced with the passage of time. Human experience teaches that the loss of an infant three months of age while calculated to cause profound grief to a parent is not so keenly or acutely felt nor is such loss likely to produce sorrow of such duration or intensity as the loss of an older child to whom the parents have had time to become more attached.
For the reasons hereinabove assigned, the judgment of the trial court is hereby amended and judgment rendered herein in favor of plaintiff Glynace H. Norton in the sum of Five Thousand Eight Hundred Seven and 45/100 ($5,807.45) Dollars, and in favor of plaintiff Ann Graves Norton in the sum of Five Thousand and 00/100 ($5,000.00) Dollars, against defendants Argonaut Insurance Company, Mrs. Florence Evans and Aetna Casualty & Surety Company, in solido, together with legal interest thereon at the rate of five per cent per annum from date of judicial demand, until paid, said defendants to pay all costs of these proceedings.
Amended and affirmed.