524 So.2d 56 (1988)
Edith Reed Keyworth, wife of/and Charles L. KEYWORTH
v.
SOUTHERN BAPTIST HOSPITALS, INC., a/k/a Southern Baptist Hospital.
No. CA-7622.
Court of Appeal of Louisiana, Fourth Circuit.
April 4, 1988.
Writs Denied May 20, 1988.
A.D. Freeman, Charlotte A. Hayes, Satterlee, Mestayer and Freeman, New Orleans, for plaintiffs.
*57 William S. Penick, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, Susan E. Henning, New Orleans, S. Alfred Adams, Carruth, Cooper, and Adams, Baton Rouge, for defendant.
Before BARRY, LOBRANO and CADE, JJ.
BARRY, Judge.
This medical malpractice suit resulted from a fall in Southern Baptist Hospital. The jury returned a verdict in favor of Baptist. Plaintiffs moved for a new trial and judgment notwithstanding the verdict. The J.N.O.V. was granted[1] and the court awarded $225,000 for general damages and $60,897.30 for medical expenses.
On February 3, 1980 Edith Keyworth, 62 years old, suffered a stroke and was admitted to Baptist's intensive care unit, then placed in a ward. Dr. Hickman, her treating physician, ordered a sitter from 11:00 p.m. to 7:00 a.m. nightly. Her husband arranged for two sitters, one from 3:00 p.m. until 11:00 p.m. and the other from 11:00 p.m. to 7:00 a.m.
Dr. Hickman also ordered that Mrs. Keyworth wear a "posey" restraining jacket and her bed rails be extended at all times. A posey jacket is a mild restraint which limits movement in bed. Mrs. Keyworth was moved to a room in the surgery ward which was directly across from the nurse's station allowing for easy observation.
On March 6 a nurse's aide found Mrs. Keyworth on the floor. Her right hip had broken in an apparent fall. The Keyworths filed suit against Baptist after presenting a malpractice claim to a medical review board pursuant to La.R.S. 40:1299.47.
The jury instructions and interrogatories covered whether Baptist was negligent and did not consider contributory negligence.
In Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270, 274 (La.1986), the Louisiana Supreme Court held that the standard for a J.N.O.V. "requires that the motion be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover."
In ruling on a motion for a judgment notwithstanding the verdict ... the trial judge considers all of the evidence and reasonable inferences in a light most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the motion should be granted and the trial judge should render a judgment notwithstanding the jury's findings. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, the motion for judgment N.O.V. should be denied. In applying this standard, the court does not weigh the evidence, pass on the credibility of the witnesses, or substitute its factual judgment for the jury's. (citations omitted)
Blum v. New Orleans Public Service, Inc., 469 So.2d 1117,1119 (La.App. 4th Cir.1985), writ denied 472 So.2d 921 (La.1985).
We first turn to the standard of care applicable to hospitals. In Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974), the Supreme Court stated:
A hospital is bound to exercise the requisite amount of care toward a patient that *58 the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case. (emphasis added)
The court pretermitted inquiry into whether a "community standard of care" is applicable to allegations of hospital negligence. See also Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 719 (La.1986).
One year after Hunt (1975) several provisions were enacted relative to a comprehensive medical malpractice scheme, including La.R.S. 40:1299.41 which provides for definitions and general applications. Paragraph 1 defines "health care provider":
[A] person, corporation, facility or institution licensed by this state to provide health care or professional services as a physician, hospital, ....
Paragraph 7 defines "tort" and the standard of care applicable to "health care providers":
The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill. (emphasis added)
R.S. 40:1299, intended to answer the question left open in Hunt, applies the "locality rule" to health care providers in cases involving negligence, but expressly exempted hospitals.
However, prior to trial herein the district court granted a motion which ordered "any testimony regarding the standard of care required of the Southern Baptist Hospital and its nursing staff will be prohibited unless such testimony is offered by a person qualified to testify regarding local standards of care in hospitals." This court found no error in that ruling and denied the writ. Keyworth v. Southern Baptist Hospitals, Inc., No. C-5524 (La.App. 4th Cir. April 29, 1986).
The Supreme Court summarily granted certiorari and stated: "Locality rule does not apply to hospitals." Keyworth v. Southern Baptist Hospitals, Inc., 491 So. 2d 15 (La. July 1, 1986).
A few months later, Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986) restated Hunt's holding that a hospital is bound to exercise the degree of care toward a patient that his or her condition requires and that this must be determined under the particular facts and circumstances of each case. But cf. Coleman v. Touro Infirmary, 506 So.2d 571 (La. App. 4th Cir.1987), writs denied 507 So.2d 1247, 1248 (La.1987).
Thus, the duty of care owed by a hospital is not governed by the locality rule.

FACTS
According to the nurse's notes, on February 25 at 2:00 p.m. Mrs. Keyworth was sleeping. The 3:00 entry shows she was found lying on her abdomen on the floor. That entry noted that Dr. Hickman was notified of this first incident.
Second and third incidents occurred on February 27. An 8:00 a.m. entry notes Mrs. Keyworth awake and alert. It also specifies that her restraining jacket was on, the side rails were up, and the call light was within reach. The 9:00 a.m. entry notes that Dr. Rogers, an associate of Dr. Hickman, found her nude on the bathroom floor when he made his rounds.
At 1:00 p.m. that day the entry states that Mr. Keyworth was at her bedside, her restraining jacket was on, and the side rails up. The 2:00 p.m. entry notes she was found standing at the bathroom door.
The fourth incident was the March 6 fall which caused Mrs. Keyworth's broken hip. The 6:30 a.m. entry notes Mrs. Keyworth was quiet in bed, the posey was on and the *59 side rails were up. The 7:15 a.m. entry states that Mrs. Keyworth was still wearing the posey when found on the floor by Ms. Kron, a nurse's aide, and the bed's rails were up.
Cathy Denning, the head nurse of the ward, made the 6:30 a.m. entry. At trial she testified regarding the entry: "I went in to check on Mrs. Keyworth that [morning]..., as I normally did, to make sure she was secured in bed." (emphasis added). That testimony is contradicted by the following listing of all entries by Denning in the nurse's notes on Mrs. Keyworth prior to March 6.

2/15 - 9:30 a.m.
2/20 - 9:00 a.m.
2/25 - 12 midnight
 2-4 a.m.
 4:45-5:30 a.m.

We note that except for the March 6 entry at 6:30 a.m. (just before the accident), the first entry by anyone on the day shift was never prior to 7:30 a.m. while Mrs. Keyworth was on the seventh floor. Of the twenty days she was in that ward prior to the accident, the initial check by the day shift was six times at 7:30 a.m., twelve times at 8:00 a.m., one time at 8:30 a.m. and once at 9:40 a.m.
The entries relating to each of the first three incidents indicate that Mrs. Keyworth extricated herself within an hour's time. She managed this even though, according to the nurse's notes, the posey was in place and the side rails were up at the time of the second and third incidents.
Based on the nurse's notes of the first three incidents, there is no question the nursing staff was aware of Mrs. Keyworth's ability to get out of bed within an hour's time despite the ordered precautions. This conclusion is supported by the fact that the nurses referred to Mrs. Keyworth as "Houdini". We find there was an unquestionable duty on the part of the hospital to implement whatever precautions were necessary to prevent predictable future incidents from occurring.
Baptist urges it met that obligation.
According to the notes, Nurse Denning spoke to Mr. Keyworth on February 26 at 6:30 p.m. That conversation was prior to the second and third incidents and reads:
I spoke [with] Mr. Keyworth on 2/26/80 concerning his possibly turning the posey jacket around or untieing it and forgetting to refasten it. He denied the above and I stressed the importance of us keeping Mrs. Keyworth secured in the bed in order to prevent her falling & possibly doing some physical injury to herself. He asked that she be almost constantly checked onI explained we look in on her about every ½-1½ hrs. but constant attention requires private duty nurses. No one has actually seen [patient] untie posey.
The notation does not specify that Nurse Denning informed Mr. Keyworth of his wife's fall on February 25. Since it was prior to the second and third incidents, those would not have been mentioned (however, we note that Nurse Denning made that notation as a late entry, some four hours after the second incident and within an hour prior to the third incident).
The entry fails to show Mr. Keyworth was informed of a problem with Mrs. Keyworth getting out of bed. Rather, it indicated a concern for Mrs. Keyworth's jacket being untied. The comment about getting fulltime sitters appears to respond to Mr. Keyworth's request for more attention for his wife, not a specific request by the nurse as a safety precaution.
Nurse Denning testified that she had spoken to Mr. Keyworth and Penny Palmisano, Mrs. Keyworth's daughter. However, except for the above conversation there is nothing in the hospital record, including the nurse's notes, to reflect these conversations or (more importantly) their content.
Nurse Denning could not recall what was said during those conversations. She testified that her conversations with Penny Palmisano was about her mother's safety, but that she did not know the dates. She did not recall the first time nor did she remember "exactly" what she said. She surmised:

*60 Basically we talked about the fact Mrs. Keyworth could get up out of the bed or wiggle out of the posey, .... Occasionally, we found it untied and in general what was going on with her mother.... That's to the best of my recollection.
She presumed those conversations took place after she was aware that Mrs. Keyworth was able to get out of bed.
COUNSEL: Do you remember talking to Penny around the 26th, the 27th, it being the day she got out of bed twice?
DENNING:
Mr. Freeman, I do not know. I feltI'll be perfectly honest with youI felt like I talked to her about Mr. Keyworth. (emphasis added)
COUNSEL:
That's not what I asked.
DENNING:
I don't know.
COUNSEL:
Let me finish my question. I'm not tying you down to dates. I just want you to tell me to the best of your recollection when you talked to Penny Palmissano about her mother's safety?
DENNING:
To the best of my recollection I talked to her on a number of occasions prior to her mother falling and breaking her hip because we were very worried about her and she would come and ask for a report on her mother. I talked to her on several occasions prior to that time. I can tell you the date she came on my unit. I can tell you the time she was injured. Based on the record I can tell you there were several occasions, but those verbatim conversations each time it was done is not documented.
COUNSEL:
Isn't it fair to say if Mrs. Keyworth was found on the floor on the first time on February 25th, 1980, that you would not have spoken to Penny about her mother's safety prior to that time because the problem didn't exist at least to your knowledge?
DENNING:
Could you repeat the question for me?
If it's specifically about her safety I do not recall. I do know we talked about other things with her mother.
I believe that when Mrs. Keyworth came to my unitas a matter of fact, I know there was some other problem concerning her transportation to and from physical therapy. That was a safety problem that was also discussed with Mr. Keyworth and Penny, the stepdaughter.
COUNSEL:
I'll ask it one more time: Did you ever talk to her, to Penny before the 25th of February, 1980 about her mother being able to get out of bed and get on the floor or stand in front of the bathroom door?
DENNING:
I do not remember specifically talking to Penny about that specific incident, no, Mr. Freeman.
COUNSEL:
That specific incident or similar incidents had not happened before February 25th, isn't that true?
DENNING:
In exactly those terms, no, sir, as far as we can tell from this.
Penny Palmisano's uncontroverted testimony states that on February 24 she went to Illinois for a funeral and did not return home until March 2. She did not see her mother until March 5, the day before Mrs. Keyworth's accident. On that date no one informed her of any problem regarding her mother's safety.
We are not persuaded that these unparticularized (and mostly undocumented) conversations could discharge the hospital's duty to implement extra precautionary measures. Mrs. Keyworth's family was not informed a problem existed, the dangers involved, the possible solutions, and the immediate need to implement extra precautionary measures. While that duty could have been discharged by having around-the-clock sitters, it was incumbent on the hospital to see that the doctor's orders encompassed this safety measure and those orders were implemented.
*61 The hospital failed to implement any further precautions. Under these circumstances, reasonable persons could not have concluded that there was no negligence on the part of Baptist.
Nonetheless, Baptist urges facts which, if proven, allegedly constitute contributory negligence, which it specifically pleaded. At the time of the incident in question, contributory negligence was a bar to a victim's recovery, regardless how slight that negligence might be. Over Baptist's objection the jury was neither instructed nor charged as to the possible contributory negligence of the plaintiff. Though the jury should have been allowed to make that factual determination, their finding of no negligence on the part of Baptist would have precluded them from reaching this issue.
Since the record is complete, we will consider the facts as to the allegation of contributory negligence. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Thomas v. Missouri Pacific R. Co., 466 So.2d 1280 (La.1985); Woods v. Cumis Ins. Soc., Inc., 364 So.2d 213 (La.App. 4th Cir. 1978).[2]
There was evidence that on March 4 Dr. Hickman admonished the patient not to get out of bed without assistance. There was also testimony from defense experts that notations in the chart did not indicate Mrs. Keyworth might not understand. Baptist urges that these facts indicate Mrs. Keyworth knew she should not get out of bed unassisted, yet did so anyway.
The record indicates Mrs. Keyworth had been found twice on the floorone time nude. Had she been capable of understanding that she should not get out of bed unassisted, surely it would have been clear to her without the admonition from her doctor. Further, when Dr. Tom Oelsner, one of the defendant's experts, opined that based on the chart Mrs. Keyworth would be able to understand those instructions, he further explained:
There is [sic] all different degrees of mental function. She may be able to understand it, but five hours later with an urge to go to the bathroom she may think it means something different, and even though she is normally alert there are times when people ignore instructions or forget, then convince themselves that the doctor meant something else.
Marie Guidry, a practical nurse who attended Mrs. Keyworth after she returned home, testified that Mrs. Keyworth was mostly confused during the time she took care of her, though she was mentally alert. This was a period beginning about three weeks after the injury and extending for approximately four months.
Considering the entire record we find Baptist's argument unpersuasive.
Baptist appears to urge that Mrs. Keyworth's claim is barred because her family was negligent by not providing round-the-clock sitters or nurses. The "[n]egligence of either spouse cannot be imputed to the other merely because of the marital relationship." Lewis v. Till, 395 So.2d 737 (La.1981). We see no other arguable basis for this proposition. We note that Baptist's position suggests the family was a joint tortfeasor, however, Baptist did not reconvene or make a third-party demand.

QUANTUM
Baptist and intervenors, the Commissioner of Insurance, the Office of the Attorney General, and the Louisiana Patient's Compensation Fund, urge plaintiff did not establish damages caused by their negligence. They reason that some of her disability must be attributed to the stroke. They also urge that the award was excessive.
The evidence indicates that the day before the accident Mrs. Keyworth was ambulating eighteen feet three times on parallel bars without assistance and was progressing satisfactorily. Dr. Russo, Baptist's expert, operated on Mrs. Keyworth's broken hip. He testified that at discharge *62 Mrs. Keyworth was having trouble with her hip, including bursitis type pain at the point the metal plate was inserted in her hip. That pain sometimes required an injection and oral medication. She had a slight limp and her shoe had to be built up a bit.
Dr. Ploger, plaintiff's expert, saw Mrs. Keyworth in September 1985 for pain in her right hip area which was characterized as from the 1980 fracture. Mrs. Keyworth had an open reduction, internal fixation of the fracture site. A metal plate, flanged nail and four screws had been used. After the fracture healed, Mrs. Keyworth went to therapy. He noted no previous history of injury to the right hip.
Dr. Ploger examined Mrs. Keyworth and her x-rays. Her right foot turns when she walks and she has difficulty turning. Her right leg and thigh are smaller than her left leg and thigh. Her right hip motion is restricted. Abduction of her right leg to 45° causes pain. Dr. Ploger thought that even though removal of the plate, nail and screws would bring some relief, her pain was not localized around the plate.
Finally, Dr. Ploger testified he thought the disability in her right hip was a result of the fracture and was independent of any other problems. Though he found degenerative arthritis in her spinal column, he did not feel any of her complaints were related to arthritis since she did not complain of back pain.
Mrs. Keyworth testified as to her daily routine. After rising she takes a shower while sitting on a shower stool, then takes six steps to the basin. She takes coffee in the kitchen and reads the paper. She prepares a sandwich and a glass of milk and gets dressed after lunch. Mr. Keyworth fixes dinner and they watch television. She goes to bed by 10:30 p.m.
The only thing she can't and won't do alone is take a walk for fear she might fall. Her leg constantly hurts and pain extends from her foot to the metal plate. She takes pain pills three times a day and a sleeping pill.
She has used a cane since she returned home and is fearful of not using the cane because her leg is weak. She occasionally uses a wheelchair if they go to a shopping center or do something special. Though she can no longer walk comfortably, she used to "kick up her heels" and dance.
Mr. Keyworth testified that Mrs. Keyworth tires after walking about half of a block despite daily therapy for several months after she returned home. Mrs. Keyworth does no housework, rather Mr. Keyworth prepares dinner and does household chores after returning from work about 6:30 p.m. They go out to dinner occasionally where they can walk in without encountering stairs.
Marie Guidry, one of three practical nurses who took care of Mrs. Keyworth in her home, testified that when Mrs. Keyworth returned home, she had to use a wheelchair to avoid putting weight on the leg. During the four months she was there Mrs. Keyworth could not bathe or dress herself. Walking was difficult and accomplished only with a walker or with assistance and Mrs. Keyworth only went out to see the doctor.
While there is other testimony regarding Mrs. Keyworth's confusion (undoubtedly caused by the stroke) and her hospital stay prior to the accident, we find ample evidence of injury caused by the hip fracture during the fall and not related to the stroke. Her inhibited walking, despite fair mobility otherwise, and pain localized to the right leg, established a causal relationship between the damages and the fall.
An appellate court cannot disturb a damage award unless the record clearly reveals that the trier of fact abused its discretion in making the award. La.C.C. Art. 2324.1 (pre-1984 Art. 1934(3)); Reck v. Stevens, 373 So.2d 498 (La.1979). We find no abuse of discretion.
The judgment is affirmed.
AFFIRMED.
LOBRANO, J., dissents with reasons.
LOBRANO, Judge, dissents.
Applying the criteria articulated in Scott v. Hospital Service District No. 1 of the *63 Parish of St. Charles, 496 So.2d 270 (La. 1986), I would reverse the J.N.O.V. and reinstate the jury verdict. The evidence does not strongly or overwhelmingly point to a conclusion that the hospital was at fault in causing plaintiff's injuries so as to justify a J.N.O.V. My review of the evidence shows the following.
Dr. Robert H. Waldham was the only expert witness to testify for Mrs. Keyworth. Dr. Waldham, a specialist in internal medicine concluded that the care provided by the nurses at Baptist fell below the acceptable standards in this case. This witness opined that the hospital did not take all the precautions necessary to prevent the injury. The additional precautions would have included instructing the family to obtain round the clock nurses or sitters, using a stronger measure of restraint, i.e. wrist and ankle restraints, or transferring the patient to the intensive care unit or to another facility. It was this doctor's opinion that the hospital provided the wrong size posey jacket to the patient, thus allowing for easier escape from the jacket. He also testified that while the average time for rounds by the nurses was 1-2 hours, the 45 minute intervals in this case were unreasonable. Since this patient was confused and disoriented, the hospital owed her a higher duty of care than the usual patient received.
Nurse Cathy A. Denning was the head nurse on duty at the time of the accident. She testified as an expert in nursing care. She stated that the patient had escaped from her posey jacket and was found in her room, out of bed, on three occasions. Once on February 25, 1980 and twice on February 27, 1980. As a result of these incidents, extra precautions were taken to make sure that the patient was watched more closely and checked more often than other patients. This witness testified that she talked to appellee's husband and daughter about appellee getting out of her jacket and out of bed. Additionally, on February 26, 1980, she discussed the situation with Mr. Keyworth and stated "you should have round the clock nurses for your wife or round the clock sitters." Nurse Denning stated that she also discussed the problems of Mrs. Keyworth's safety with Dr. Hickman, the treating physician. According to this witness, Mrs. Keyworth was observed every one-half to one hour which is above the necessary standard of care. On several occasions Nurse Denning found the posey jacket untied. This could not have been done by the patient. The witness stated that the posey jackets were not escape proof, and that leather or cloth ankle and wrist restraints were not applied because it is thought to be dehumanizing and could cause swelling and circulation problems. On the day of the accident, Nurse Denning checked appellee at 6:30 a.m. and found her sleeping with the posey jacket securely fastened and the bed side rails extended. At 7:15 a.m. she was told that the patient had been found on the floor of her room. She checked the condition of Mrs. Keyworth and immediately phoned Dr. Hickman. There was no indication that the patient was confused or disoriented before or after the accident.
Dr. Courtney Russo is an orthopedic surgeon. He performed the hip surgery on the plaintifff and provided follow up treatment for two years. It was Dr. Russo's opinion that the patient received good medical care at Baptist. He was one of the panel members on the medical review board. He stated that the family members were informed that the patient had gotten out of bed and her posey jacket. They were requested to have a family member or private sitter in the room at all times. The doctor felt that the family was partially negligent by not providing the additional care necessary. Dr. Russo stated that the medical review board found no evidence of negligence on the part of Baptist, and that Baptist met the applicable standards of care.
Dr. Lynn E. Hickman, the treating physician, is a board certified specialist in internal medical. He testified that shortly after plaintiff was admitted to Baptist he ordered the application of a posey jacket and extension of the bed side rails. The witness knew that the jacket was not escape proof, but felt that the use of arm and leg restraints would cause extreme complications. *64 Dr. Hickman expressed that he had satisfactory communications with the family and discussed the patient's condition and medical care with the family two to four times per week. He further stated that he had talked to the family about having outside personnel care for Mrs. Keyworth. The doctor testified that he suggested that the patient could receive more appropriate care in a rehabilitative facility, but the patient and family refused to be transferred from Baptist. This witness related that the patient was not taking any medication that could cause confusion and there was no entry in the record stating that she was confused or disoriented immediately before or after the accident. Moreover, Dr. Hickman indicated that the patient appeared to understand when he talked to her, and that prior to the accident he had instructed her not to get out of bed unless someone helped her. In this witness's opinion, plaintiff received excellent care from Baptist Hospital.
Dr. Tom Oelsner is board certified in internal medicine. He stated that he was familiar with the type of restraining jacket used on plaintiff. He further stated that although the jacket is used to prevent a patient from falling out of bed, it is not fail safe. Dr. Oelsner testified that the nurses notes taken prior to the accident referred to the patient as being alert and awake and that she was checked frequently. In this witness's opinion, the use of any other type of restraint would have been improper since the risk would have outweighed the benefits and would be counter-productive to the treatment of the patient's stroke. According to this witness, the fact that plaintiff could get out of her safety jacket, out of bed, and fall on the floor between the time she was checked at 6:30 a.m. and 7:14 a.m. did not indicate that the nurses were derelict in their duty. In Dr. Oelsner's opinion, the frequency of observations made by the nurses reflected good nursing care and a review of the entire nursing chart indicated that the nurses were not negligent in causing Mrs. Keyworth's accident.
Dr.Horace J. Baltz is a specialist in internal medicine. He also served on the medical review panel in this case. Dr. Baltz stated that the board found no evidence of negligence on the part of the nurses or the hospital. It was this witness's opinion that the patient received proper nursing care, and the 45 minute interval of checking the patient was within the standard of care. Dr. Baltz stated that the purpose of the posey jacket was to keep the patient in bed, and it is not designed to be escape proof. He additionally related that because a hospital is not able to provide constant observation through regular nursing staff, the family is often requested to provide sitters or a licensed practical nurse.
Mrs. Elizabeth B. Reed testified as an expert in nursing care. Nurse Reed is familiar with the restraining jacket used on plaintiff. The purpose of these jackets is to provide a form of mild restraint. She testified that the size of the jacket is not essential since a small person can be properly restrained using a medium size jacket. This witness was of the opinion that the patient was not disoriented or confused prior to the accident. Nurse Reed saw no apparent reason to use greater restraints on the patient prior to the accident. She stated that hospitals do not provide constant 24 hour observation other than in an intensive care ward. According to Nurse Reed, there was no reason to place the patient in intensive care. Nurse Reed testified that the standard time between nurses' rounds is every two hours. In this witness's opinion, Baptist Hospital provided the optimum level of care and there were no additional steps that the nurses could have taken which would have prevented the accident.
NOTES
[1] We note La.C.C.P. Art. 1811(C)(1) which provides:

If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
Since we affirm the district court's grant of the motion for judgment notwithstanding the verdict, there is no problem with the district court's failure to make a ruling on the motion for new trial.
[2] Judge Barry notes his belief that the initial determination of facts by an appellate court denies plaintiffs their right to a trial by jury. See Gonzales v. Xerox, 320 So.2d at 166. (C.J. Dixon dissenting); Picou v. Ferrara, 483 So.2d 915, 918 fn. 4 (La.1986).