661 So.2d 1010 (1995)
Harold DONALDSON, et ux, Plaintiffs-Appellees,
v.
Dr. Charles SANDERS, et al., Defendants-Appellant (St. Francis Cabrini Hospital).
No. 94-1366.
Court of Appeal of Louisiana, Third Circuit.
July 19, 1995.
Rehearing Denied November 7, 1995.
*1012 Edward Ashton Robinson, III, Clarence Horace Thornton Jr., Baton Rouge, for Harold Donaldson.
Frederick Bernard Alexius, Catherine G. Brame, Alexandria, for Charles Sanders.
Margaret Diamond, Stephanie M. Lawrence, New Orleans, for St. Francis Cabrini Hosp.
Before YELVERTON, KNOLL, COOKS, SAUNDERS and SULLIVAN, JJ.
SAUNDERS, Judge.
St. Francis Cabrini Hospital appeals the judgment of the trial court finding it liable in a medical malpractice action for the actions of one of its nurses. We reverse.

FACTS
Harold Donaldson entered Cabrini Hospital on June 8, 1989, with atrial fibrillation, right-side paralysis, a dilated heart, and speech impairment. During his hospital stay, if not before, Mr. Donaldson developed blood clots that restricted circulation to his left leg, superimposed on an underlying peripheral vascular disease. Mr. Donaldson, who had a history of congestive heart failure, kidney troubles, and depression, each requiring that he take medication, had suffered a stroke, his second in four years. Mr. Donaldson was scheduled for discharge on or *1013 before June 17, when the complications giving rise to this dispute arose. These complications would cause Mr. Donaldson to lose his left leg below the knee.
The ultimate question presented, whether Cabrini Hospital is culpable for this terrible loss because of the inactions of its nursing staff, turns on the factual and legal causes of Mr. Donaldson's misfortune.
Mr. Donaldson and his family originally alleged fault on the part of Donaldson's treating physician and the hospital that employed the nurses in charge of his care. The case was submitted to a medical review panel whose medical members unanimously concluded that neither Dr. Charles Sanders, who had treated Donaldson upon his admission to the hospital, nor Cabrini Hospital's nurses were negligent.[1]
Donaldson and his wife then took their cause to court, filing suit on May 29, 1992. The trial court found that Felicia Veal, the nurse on duty on the night of June 16, should have notified Dr. Sanders that Donaldson's foot had turned blue; that her decision not to contact Dr. Sanders caused Donaldson's poor condition to worsen; and that Cabrini Hospital, as the employer of Nurse Veal, was liable for the damage caused by Nurse Veal in failing to properly carry out her duties as a nurse.
Cabrini Hospital appeals the judgment of the trial judge finding it liable to Donaldson for $150,000 for past, present and future pain and suffering and $50,000 for past, present and future medical expenses, and to Donaldson's wife for $25,000 for loss of consortium.
As noted above, the issues are whether Cabrini's nursing staff should have notified physicians sooner and, if so, whether the physician's notification might have saved Mr. Donaldson's limb. We address these questions separately.

NURSE VEAL'S DUTY
Plaintiffs argue that Nurse Veal should have contacted plaintiff's treating physician during her 7:00 p.m.-7:00 a.m. shift of June 16 and 17, due to plaintiff's deteriorating medical condition.
Cabrini Hospital does not deny that Nurse Veal was required to notify the doctor of all medically significant changes in the patient's condition; rather, it simply claims that there was no significant change in the patient's condition during Nurse Veal's watch because his foot had circulation throughout Nurse Veal's shift, as reflected by the continuing presence of a pedal pulse. While Mr. Donaldson's foot might have shown some discoloration, because he had a pedal pulse throughout the evening, the hospital maintains that there was no significant change in the relevant sense. Because the changes in the foot's coloration in isolation did not represent significant changes per se, it postulates that Nurse Veal was not required to notify a doctor of such a change.
In essence, Cabrini argues that even if Mr. Donaldson's foot had become more discolored during Nurse Veal's shift, which it denies, the trial court committed legal error in imposing upon Nurse Veal a duty to report even though Donaldson had a palpable pedal pulse in both feet throughout her shift.
Nurse Felicia Veal, the alleged tortfeasor, worked the 7 p.m. to 7 a.m. shift on the night of June 16. At 7:30 p.m. and on seven other occasions she assessed Donaldson and noted that his left pedal pulse was palpable but weak, his lower extremity was cool, and his left foot exhibited some bluish discoloration. His peripheral pulse was also weak.[2] Nurse Veal decided not to call Mr. Donaldson's treating physician, Charles Sanders, during her graveyard shift because she did not believe Mr. Donaldson's condition warranted his immediate attention in view of the presence of a pedal pulse. Instead, she thought it appropriate that she monitor her *1014 patient's condition throughout the night and take steps to ascertain that Dr. Sanders would see Mr. Donaldson on his regularly scheduled rounds soon after her shift ended.
When Dr. Sanders examined Donaldson at 9:00 a.m. the next morning, two hours after Nurse Veal's shift ended, he found Donaldson's leg to be cyanotic and painful. At that point he consulted Dr. Curt Smith, a cardiovascular surgeon who would eventually perform surgery on Donaldson. By the time he evaluated Mr. Donaldson, Dr. Smith believed that the ischemia (reduced blood circulation) might have developed to a point where an amputation would be necessary, but nonetheless thought it worthwhile to attempt to save the limb by surgically restoring the diminished blood flow.
An embolectomy, the surgical removal of a clot, and a fasciotomy, a procedure to relieve the pressure, were performed by Dr. Smith the afternoon of June 17.[3] The procedures were successful. Nonetheless, due to the onset of gangrene, Donaldson's left toes had to be amputated several weeks later, on July 3, 1989, followed by his left leg below the knee on July 6, 1989.
The first question is whether the trial court erred in concluding that Nurse Veal was required to contact Mr. Donaldson's treating physician during her graveyard shift in the face of his foot's discoloration notwithstanding the presence of a pedal pulse. Because this question presents a legal issue, we will turn to the jurisprudence and statutory law of this state.
The "duty-risk" analysis is employed in Louisiana to determine whether liability exists under the facts of a given case.
... In making the requisite analysis four questions are to be considered:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
Mart v. Hill, 505 So.2d 1120, 1122 (La.1987).
In suits alleging medical malpractice, it is the plaintiff who must prove the applicable standard of care, the breach of that standard, and that the substandard care caused an injury that the plaintiff would not have otherwise suffered. La.R.S. 9:2794; Byrd v. State, Through Dept. of Public Safety, 93-2765 (La. 5/23/94); 637 So.2d 114.
As the Louisiana Supreme Court noted in Mundy v. Dept. of Health & Human Res., 620 So.2d 811 (La.1993), whether the defendant has breached a duty owed is a question of fact, but whether a duty is owed is a question of law. To determine the latter, "the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim." Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 292 (La. 1993) (cite omitted).
We now address whether the trial court erred in its interpretation of the standard of care required by this state of Nurse Veal the night of June 16: Was Nurse Veal, as the trial court determined, obligated to notify plaintiff's treating physicians; or, as the medical review panel concluded, was she expected to do no more than continue monitoring the course of her patient during the evening and seek a medical doctor's evaluation of her patient's condition the following morning, during his regular morning rounds.
In certain situations, the duty imposed upon a medical provider is established by his or her medical community's standards; at other times, this is not the case.
For instance, the locality rule does not apply in cases calling into question the *1015 duty of care owed by hospitals where the skills of individual licensed health care staff are not called into question. Cornett v. State, through W.O. Moss Regional Hosp., 614 So.2d 189 (La.App. 3 Cir.), writ denied, 617 So.2d 906, 907 (La.1993), citing Keyworth v. Southern Baptist Hospital, 491 So.2d 15 (La.1986) and Griffin v. Kinberger, 595 So.2d 645 (La.1992).[4] But the locality rule does apply where a hospital's liability is alleged to arise through the alleged malpractice of a nurse.
It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession of good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Norton v. Argonaut Insurance Company, 144 So.2d 249 (La.App. 1st Cir.1962).
Novak v. Texada et al. Clinic, 514 So.2d 524, 526 (La.App. 3d Cir.), writ denied, 515 So.2d 807 (La.1987).
In the current dispute, plaintiffs allege liability on the part of Cabrini Hospital through the negligence of its nursing staff; therefore, the locality rule is applicable. Novak v. Texada et al. Clinic, 514 So.2d at 526, citing Norton v. Argonaut Insurance Company, 144 So.2d 249 (La.App. 1st Cir.1962).[5]
Having reviewed the evidence, we hold that the trial court erred in applying a standard of care alien to the community in which Nurse Veal practiced, the effect of which was to impose upon Nurse Veal a heavier obligation than that imposed by the laws of this state. By an overwhelming preponderance, the evidence suggests that Nurse Veal was required to do no more than monitor Mr. Donaldson's situation, at least with respect to his foot and lower leg in the presence of a pulse.
Called to testify by deposition in support of plaintiff's theory was Dr. Leon Stechenberg, a Massachusetts general and vascular surgeon. Dr. Stechenberg did not quarrel with characterizing Mr. Donaldson as an elderly hypertensive patient who had extensive *1016 cerebral vascular and peripheral vascular disease and heart disease with intermittent atrial fibrillation, congestive heart failure, and ventricular tachycardia when he presented to the hospital in June 1989. Nor did he quarrel with the amount of time Nurse Veal gave Mr. Donaldson during her graveyard shift, as Nurse Veal checked on Mr. Donaldson every hour and a half. Dr. Stechenberg believed that Nurse Veal did not need to check on her patient more than the once every four hours.
Rather, having conceded that palpable pedal pulses generally mean good circulation, Dr. Stechenberg's conclusion that Nurse Veal's care deviated from appropriate standards was premised upon his determination, bereft of eyewitness credibility, that Nurse Veal took an inaccurate pulse from Mr. Donaldson's foot, and her failure to have a medical doctor check her patient's pulse in the presence of its limited discoloration. Dr. Stechenberg, who conceded that he had not seen Mr. Donaldson before formulating his opinion, nonetheless testified that the physical findings, particularly the bluish discoloration of the foot noted by Nurse Veal, should have alerted her to inform the doctor of a substantial change in the status of the leg. Dr. Stechenberg, who conceded that he would not treat a patient based on review of a medical record without being able to examine the patient, nonetheless passed judgment on this issue without the benefit of such an examination, (initially) before reviewing statements by the nurses who were on duty June 16-17, and without the benefit of a pathology report.
Nathan Smith, plaintiff's nursing expert, seconded Dr. Stechenberg's opinion that Nurse Veal should have notified Dr. Sanders, plaintiff's treating physician, of the purported changes. According to Nurse Smith, Nurse Veal noted a weak pedal pulse, cool lower extremities, and bluish discoloration, all indicators of a circulation problem; there being a circulation problem (however slight), Nurse Veal was required to contact Dr. Sanders, in the opinion of this expert.
Cabrini's position is supported by the testimony of several doctors, including Dr. Smith, Dr. Henry Hanley, professor of medicine and chief of cardiology at LSU Medical Center in Shreveport, as well as by the physician members of the medical review panel, Drs. Hovnatanian, Ertan, and Barton, all Louisiana physicians, who testified that the presence of a pedal pulse on June 16 would mean that some circulation was getting to the leg, and that therefore observation was all the condition called for. Each of the members of the medical review panel, including the physician appointed by plaintiff, testified at trial. Dr. Gourgen Hovnatanian, a vascular surgeon, concluded that even a weak pulse eliminated the need for Nurse Veal to contact plaintiff's treating physician. Because plaintiff had a pulse throughout Nurse Veal's shift, Dr. Hovnatanian was satisfied with the diligence of Cabrini's nursing personnel, even if discoloration had been present.
Dr. Hovnatanian's opinion was supported by the other physicians on the medical review panel, Dr. Tunkay Ertan and Dr. Bruce Barton, both internal medicine physicians. Like Dr. Hovnatanian, these doctors were of the opinion that the presence of a pedal pulse in plaintiff's foot throughout Nurse Veal's watch ruled out the need to contact any physician.[6] Additionally, Dr. Barton could see no problem with the nurse's waiting to advise the treating physician on his regular rounds, nor anything suspicious in the hospital's claim that Mr. Donaldson's pulse to the lower extremities must have stopped between the conclusion of her shift at 7:00 a.m. on June 17, 1989, and 9:00 a.m. later that morning, when Dr. Charles Sanders noted a complete absence of circulation.
These conclusions were identical to those of Dr. Hanley, who has experience teaching nurses and devising medical procedures in Louisiana. Dr. Hanley believed that Nurse Veal acted properly. She evaluated the patient, and according to Dr. Hanley her "non-specific findings that could be due to a number of things" in this case required her to do no more than precisely what Nurse Veal did, continue monitoring her patient's progress.
*1017 Even plaintiff's expert in internal medicine and cardiovascular diseases, Richard Friedlander, M.D., Columbia University, could not state that Cabrini's nursing staff failed to comply with the requisite standard of care due to the presence of even a diminished pulse.
Having reviewed the evidence in this case, we conclude that it overwhelmingly supports defendant's position that, regardless of the standard of care applicable elsewhere, Nurse Veal's obligation to her profession and patient were satisfied by her frequent monitoring of plaintiff's condition and considered decision to not contact Dr. Sanders sooner due to the presence of a pulse, which Louisiana nurses, according to each of the physicians most familiar with the subject,[7] are qualified to administer without the assistance of a physician. The effect of the trial court's legal error was to impose upon Nurse Veal an overly oppressive standard of care, one not supported by the law.
Recognizing the folly of permitting Louisiana legal experts, no matter how well intentioned, to arbitrarily fix some level of medical care as the standard and then hold the medical community to it, the laws of this state constrain courts as well-intended novices to rely upon medical experts to discern the standards of the community when determining ex post facto whether a medical professional has complied with her standards. La.R.S. 40:1299.41(A)(7), quoted above. In Louisiana, a civilian jurisdiction, when the wording of a statute is clear and free of ambiguity, its letter shall not be disregarded under the pretext of pursuing its spirit. La. R.S. 1:4. The standards governing the actions of medical professionals by legislative fiat are established by custom, and as medical professionals, nurses are subject to the same standard as doctors. The locality rule is applicable to malpractice actions filed against them. La.R.S. 40:1299.41(A)(7). The trial court erred in failing to judge Nurse Veal's actions on the basis of her locale, and as to the first assigned error we reverse on that basis.
While it is true that the amount of weight the trier of fact places on expert testimony is entitled to great weight on appeal, Jackson v. D.C. Kile, Inc., 614 So.2d 225 (La.App. 3 Cir.), writ denied, 616 So.2d 702 (La.1993), this rule of thumb is not without limitation. The weight that a trial court accords the testimony of expert witnesses depends largely on their qualifications and the facts on which they base their opinions. Cockerham v. Atlantic Richfield Co., 615 So.2d 547 (La.App. 3 Cir.), writ denied, 623 So.2d 1303 (La.1993). These rules are no less relevant in the context of medical malpractice suits that are governed by local standards.
Our reversal of the trial court's conclusion as to the first issue does not by itself end the inquiry, however. While we find merit to Cabrini's appeal as to Nurse Veal's responsibility for the loss of plaintiff's leg and foot on grounds that plaintiffs failed to show that Nurse Veal violated her duty in refusing to contact Dr. Sanders sooner, whether she can be held liable for the loss of his toes cannot be determined on the same basis, as there is some evidence to suggest the possibility that plaintiff's toes were in a more advanced state of need than the remainder of the affected limb during Nurse Veal's shift.[8]
While the first surgery performed by Dr. Smith, at 1:00 p.m. June 17, successfully removed the embolus or clot, reviving blood circulation to most of Mr. Donaldson's lower extremities, the same cannot be said unequivocally with respect to the loss of Mr. Donaldson's toes: apart from questions raised as to *1018 whether Mr. Donaldson's toes were purplish-blue or necrotic black,[9] there is no question but that, unlike the remainder of plaintiff's leg, Dr. Smith could find no distal pulse even after concluding the successful operation.
Additionally, with respect to the toes, it is not so easy to conclude that the trial court erred in determining that their necrotic symptoms arose over a greater period. Whereas the evidence suggests more probably than not that the circulation to the leg and foot did not cease until after Nurse Veal's shift ended, the same cannot so clearly be stated with respect to Mr. Donaldson's toes.[10]
Consequently, with respect to Mr. Donaldson's toes, we are unable to conclude that the trial court erred in holding, contrary to the medical review panel, that Nurse Veal in fact deviated from the standard of care required of her.

CAUSE-IN-FACT
Accordingly, Cabrini's absolution for the loss of Mr. Donaldson's toes rests on the hospital's alternate theory, that the trial court erred in finding a causal connection between the nurse's inaction and plaintiff's losses.
As part of the duty-risk analysis, it is incumbent upon the plaintiff to prove by a preponderance of the evidence that the tortfeasor's conduct, in addition to violating some duty owed the victim, was the cause-in-fact of the resulting injury. Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993). Thus, arguing convincingly that a medical professional had breached the applicable standard of care does not relieve the alleged victim of the additional burden of showing by a preponderance of the evidence that this breach either caused him an injury which would not have occurred, Byrd v. State, Through Dept. of Public Safety, 93-2765 (La. 5/23/94); 637 So.2d 114, or at least reduced the likelihood of his lower extremity's survival. Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991); Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).
An act or omission is a cause-in-fact of harm to another if it was a substantial factor in bringing about the harm. Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991); Holt v. Rapides Parish Police Jury, 574 So.2d 525, 528 (La.App. 3d Cir.1991). Factors which may be considered in determining whether the actor's negligent conduct is a substantial factor include, whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of harm. Trahan v. State, Dept. of Transportation and Development, 536 So.2d 1269 (La.App. 3d Cir.1988), writ denied, 541 So.2d 854 (1989). Causation is a question of fact in which the trial judge's determinations are entitled to great weight and will not be disturbed on appeal absent manifest error. Brock v. Winn Dixie Louisiana, Inc., 617 So.2d 1234 (La.App. 3d Cir.), writ denied, 620 So.2d 848 (La.1993). Where there are factual issues upon which evidence is in conflict, reasonable evaluations of credibility and reasonable inferences of fact by the trial judge should not be disturbed on review. Dobson v. Louisiana Power & Light Co., 567 So.2d 569 (La.1990).
Raney v. Walter O. Moss Regional Hosp., 629 So.2d 485, 492 (La.App. 3 Cir.1993). In accord, Novak, 514 So.2d at 525-526.[11]
*1019 Cabrini argues that even had Nurse Veal sooner apprised Dr. Sanders of Mr. Donaldson's condition, as she would have been required to do in the absence of a pulse in his toes, still the outcome would have been no different, as Dr. Sanders would still have not come to the hospital, but instead would have directed Nurse Veal to continue observing Mr. Donaldson for substantial changes during her watchexactly what she did anyway.
We find this argument convincing.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880, 882-83 (La. 1993). Proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
This, of course, is not to suggest that we as a court of appeal have no appellate jurisdiction over questions of fact; to the contrary, the Louisiana Constitution compels us to review both questions of fact and law. La. Const. art. V, § 10(B); Ambrose v. New *1020 Orleans Police Dept. Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216. "Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support." Id., at 8-9, 221 (notes omitted).
Conduct is a cause in fact of an injury if it is a substantial factor in bringing about the injury. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La.1962). It has also been stated that defendant's conduct is a cause in fact of harm to another if but for its conduct the accident would not have occurred. Guillot v. Sandoz, 497 So.2d 753 (La.App. 3 Cir.1986), writ denied, 501 So.2d 217 (La.1986).
Guilbeau v. St. Landry Parish Police Jury, 600 So.2d 859, 862 (La.App. 3 Cir.), writ denied, 606 So.2d 544 (La.1992).
By either definition, we conclude that plaintiff did not carry his burden of proof as to causation. First, it should be observed that the presence of weak pulses in both legs, as alluded to by Dr. Hanley and others, suggests that Mr. Donaldson's eventual losses were caused by plaintiff's vascular irregularities, not by the care of his nurses. This theory is consistent with the opinion of plaintiff's treating physician, Dr. Sanders, who was of the opinion that the loss of Mr. Donaldson's left leg was caused by health problems unrelated to his nursing care.
While it cannot be denied that the surgeon, Dr. Smith, did say that there would have been a greater chance of saving Mr. Donaldson's leg had he been notified sooner, that notification could only have come from plaintiff's treating physician, Dr. Sanders, with whom Nurse Veal communicated; and the record shows that Dr. Sanders probably would not have examined his patient earlier than his regularly scheduled hospital rounds even had Nurse Veal apprised him of Mr. Donaldson's condition.
According to his own testimony, Dr. Sanders would not have visited Mr. Donaldson prior to his regular rounds unless Nurse Veal had told him that Mr. Donaldson's condition had deteriorated substantially during Nurse Veal's shift.[12] The presence of a pedal pulse, in Dr. Sanders' mind, was significant in this regard.
At trial, Dr. Sanders stated that bluish discoloration, coolness, and weak pedal pulse notwithstanding, in his opinion, Mr. Donaldson's leg would have not reached the point of danger without the lapse of twelve hours with no blood supply; more importantly, looking at the leg several hours later that day after Nurse Veal's shift ended, it was even then, in his opinion, only mildly ischemic, if at all.[13]
While it may be true that plaintiff's expert Dr. Stechenberg hypothetically may have come had he been called, the fact of this matter is that Dr. Sanders, plaintiff's treating physician, would not have. This fact defeats plaintiff's case insofar as it defeats his claim that Nurse Veal's failure to contact Dr. Sanders during her shift was a cause-in-fact of his terrible losses.[14]
For the foregoing reasons, we reverse the judgment of the trial court, at plaintiffs-appellees' cost.
REVERSED.
*1021 YELVERTON, J., dissents and assigns reasons.
COOKS, J., dissents for the reasons assigned by YELVERTON, J.
YELVERTON, J., dissenting.
I dissent. The video deposition expert testimony supports the trial judge's findings of fact. The majority knows this, and knows it cannot reverse for manifest error with this evidence in the record. So the majority resorts to the simple expedient of getting rid of the evidence. By pronouncing that the two experts, Drs. Friedlander and Steckenberg, who were from New York and Massachusetts, were not competent witnesses for geographical reasons alone, the majority concludes it was legal error for the trial judge to consider their testimony.
The video depositions of these doctors were taken in their cities of residence. Cabrini's attorney was present. The competency of the witnesses was never questioned. It was never asked whether the nurse standard of care differed in New York, Massachusetts, and Louisiana. The questions, both direct and cross, assumed no different standard. At the trial the video depositions were received in evidence without objection. The locality rule standard of care was never an issue at the trial. In reasons for judgment the trial judge did not mention it because it was not an issue. On appeal Cabrini has not assigned it as error in brief, and did not argue it orally, before either the three-judge panel or the five-judge panel. The majority's opinion is the first mention of the locality rule and its effect on the standard of care in this case. I submit that this violates basic rules of fair play and orderly procedure in litigation.
A decision of what is the applicable standard of care in a particular case is subject to review by the standard of manifest error, as it is based on the evidence and testimony applicable in the case. The uncontradicted testimony was that the absence of a pedal pulse would have been a sure sign for Nurse Veal that Mr. Donaldson had lost circulation to his foot. However, I cannot agree with Cabrini's proposition that, therefore, the presence of any pulse despite other symptoms means there was no significant medical problem. As to this the medical testimony was in dispute. In this case there was a weak pedal pulse plus a bluish discoloration noted by Nurse Veal for the first time at 7:30 in the evening. Cabrini admits that Nurse Veal was required to notify a doctor of all medically significant changes, but argues that Donaldson's foot turning blue was not a medically significant change. However, there is evidence in the record substantiating the trial judge's conclusion that a blue discoloration of the left foot was a medically significant change and that Nurse Veal should have notified the doctor about it.
The nursing standard of care in Louisiana in the minds of the majority has suddenly emerged as the all important question in the case. If that is so, then surely it means something that there were two nurses who testified as members of Nurse Veal's profession pursuant to La.R.S. 40:1299.41 A(7). One was Nathan Smith from Louisiana. He testified that Nurse Veal should have notified the doctor of changes in Mr. Donaldson's condition due to his cardiovascular problems. The changes he found significant were a weak pedal pulse, discoloration of the leg, coolness of the skin and a sore on the foot. The other nurse who testified was Sandra Stagg, the nursing supervisor at Cabrini. Her only testimony regarding a nurse's duty was that nurses know when to call a doctor based on their training, education and licensure. She never expressed an opinion on the particular facts of this case. Based on this testimony, it was not manifest error for the trial judge to find that Nurse Veal breached the applicable local standard of care for nurses. That the two non-Louisiana physicians agreed with Louisiana Nurse Smith, does not mean that an alien standard was imposed; it means only that the standard for Louisiana, Massachusetts, and New York is the same. On the facts of the case, like coming in out of the rain, this makes sense.
I also disagree with the majority's finding that Nurse Veal's failure to notify the doctor was not a cause in fact of the amputation. The majority finds that even if Nurse Veal had notified Dr. Sanders of Mr. Donaldson's condition, it would not have made any difference *1022 as "Dr. Sanders would still have not come to the hospital." This is simply wrong. His testimony at p. 461 of the record clearly shows that Dr. Sanders would have come to the hospital:
Q. Dr. Sanders, isn't it true that if you had been told on the evening of June 16 that Mr. Donaldson's leg or foot was discolored and cool, with no information regarding any degree of discoloration or coolness, that you would have come to the hospital to examine him?
A. I think that had the nurse been concerned about the color and temperature of the extremity enough to call me that yes I would have come in and taken a look at the extremity.
I would affirm the decision of the trial court.
NOTES
[1] Each of the physician members, including the one appointed by plaintiffs, concluded that Nurse Veal acted appropriately.
[2] Plaintiff's condition through the evening of June 16, although changed, did not differ greatly from June 15, when Nurse Veal observed plaintiff's lower extremities to be cool to touch, possessing a pedal pulse. Indeed, unlike her testimony as to June 16 for which she found no change in skin color, she observed that there was some change in color June 15.
[3] The record shows that the surgical facilities at Cabrini could have been made available with less than one hour's notice. It does not disclose why some four hours were permitted to lapse between Dr. Smith's examination of Mr. Donaldson's leg and commencement of procedures.
[4] ... In Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974), the Supreme Court stated:

A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case. (emphasis added)
The court pretermitted inquiry into whether a "community standard of care" is applicable to allegations of hospital negligence. See also Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 719 (La.1986).
One year after Hunt (1975) several provisions were enacted relative to a comprehensive medical malpractice scheme, including La.R.S. 40:1299.41 which provides for definitions and general applications. Paragraph 1 defines "health care provider":
[A] person, corporation, facility or institution licensed by this state to provide health care or professional services as a physician, hospital,....
Paragraph 7 defines "tort" and the standard of care applicable to "health care providers":
The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill. (emphasis added)
R.S. 40:1299[.41(A)(7)], intended to answer the question left open in Hunt, applies the "locality rule" to health care providers in cases involving negligence, but expressly exempted hospitals.
* * * * * *
Thus, the duty of care owed by a hospital is not governed by the locality rule.
Keyworth v. Southern Baptist Hospitals, 524 So.2d 56, 57-58 (La.App. 4 Cir.1988), writs denied, 525 So.2d 1058, 1061 (La.1988) (on remand) (footnote, emphasis added).
[5] Should we find fault on the part of Nurse Veal, we would of course affirm the trial court's judgment against Cabrini Hospital, as a hospital is responsible for the negligence of its employees, including nurses, under the doctrine of respondeat superior. Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App. 2 Cir.1991).
[6] Both Dr. Ertan and Dr. Barton indicated that were it their patient and they had been so contacted by Nurse Veal, they would have directed the nurse to continue observing the patient.
[7] Including Dr. Hanley, who has personally trained nurses and supervised some 20,000 pedal pulses, specifically challenged Dr. Stechenberg's and Nurse Smith's opinion that nurses in Louisiana are not qualified to take them.
[8] From the record it would appear that Dr. Smith could not answer dispositively without the benefit of additional records. While specimens were removed from plaintiff's leg which yielded no evidence of necrosis, no similar specimen was taken from below the calf. Indeed, Dr. Smith, who testifying by deposition, indicated that the discoloration of plaintiff's lower extremity might have signified necrosis, at least with respect to his toes.

Dr. Sanders did not offer his opinion as to the sufficiency of care provided by his co-defendant.
[9] Contrary to the testimony of Nurse Veal, according to Mrs. Alma Donaldson, the victim's spouse, and Mrs. Vera Zeigler, her daughter and a high school graduate, Mr. Donaldson's foot was black.
[10] After all, there is evidence in the record to suggest that Dr. Smith might have indicated upon first seeing Mr. Donaldson's condition that "this happened over a period of days."
[11] "It is well settled that an appellate court must give great weight to the conclusions reached by the trier of fact and, if there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed unless manifestly erroneous. Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1 Cir.1985), writ denied, 480 So.2d 743 (La.1986); Senegal v. George Theriot's, Inc., 445 So.2d 137 (La.App. 3 Cir.1984), writ denied, 448 So.2d 114 (La.1984)."
[12] That no actions would have been taken sooner is buttressed by the testimony of Drs. Ertan and Barton. Told of the symptoms as observed by Nurse Veal, neither would have started any kind of treatment on the 77-year-old patient.
[13] In fact, Dr. Sanders did not even believe Mr. Donaldson's toes would be lost until June 24. Dr. Sanders was of the opinion that Mr. Donaldson's unfortunate fate was attributed to his regretful medical historycongestive heart failure, kidney troubles, and two strokesnot to Nurse Veal's negligence.
[14] The doctrine of res ipsa loquitur is unavailable to establish causation, as the evidence strongly indicates that Mr. Donaldson's misfortunes were caused by other than defendants' negligence is at least as equally plausible as the evidence that it was caused by the defendants' negligence. Moreover, particularly in light of Mr. Donaldson's compromised condition, it cannot be said that the only reasonable explanation of the losses was the defendants' negligence; thus, causation cannot be presumed. See Smith v. State through Dept. H.H.R., 523 So.2d 815, 823 (La.1988).